DEPARTMENT OF JUSTICE

Office of the Attorney General

28 CFR PART 35

[Order No. ]

Nondiscrimination on the Basis of Disability in State and Local Government Services

AGENCY: Department of Justice.

ACTION: Final rule.

SUMMARY: This rule implements subtitle A of title II of the Americans with Disabilities Act, Pub. L. 101-336, which prohibits discrimination on the basis of disability by public entities. Subtitle A protects qualified individuals with disabilities from discrimination on the basis of disability in the services, programs, or activities of all State and local governments. It extends the prohibition of discrimination in federally assisted programs established by section 504 of the Rehabilitation Act of 1973 to all activities of State and local governments, including those that do not receive Federal financial assistance, and incorporates specific prohibitions of discrimination on the basis of disability from titles I, III, and V of the Americans with Disabilities Act. This rule, therefore, adopts the general prohibitions of discrimination established under section 504, as well as the requirements for making programs accessible to individuals with disabilities and for providing equally effective communications. It also sets forth standards for what constitutes discrimination on the basis of mental or physical disability, provides a definition of disability and qualified individual with a disability, and establishes a complaint mechanism for resolving allegations of discrimination.

EFFECTIVE DATE: January 26, 1992.

FOR FURTHER INFORMATION CONTACT:

Barbara S. Drake, Deputy Assistant Attorney General, Civil Rights Division; Stewart B. Oneglia, Chief, Coordination and Review Section, Civil Rights Division; John L. Wodatch, Director, Office on the Americans with Disabilities Act, Civil Rights Division; all of the U.S. Department of Justice, Washington, D.C. 20530. These individuals may be contacted through the Division's ADA Information Line at (202) 514-0301 (Voice), (202) 514-0381 (TDD), or (202) 514- 0383 (TDD). These telephone numbers are not toll-free numbers.

SUPPLEMENTARY INFORMATION:

*Background.*

The landmark Americans with Disabilities Act ("ADA" or "the Act"), enacted on July 26, 1990, provides comprehensive civil rights protections to individuals with disabilities in the areas of employment, public accommodations, State and local government services, and telecommunications.

This regulation implements subtitle A of title II of the ADA, which applies to State and local governments. Most programs and activities of State and local governments are recipients of Federal financial assistance from one or more Federal funding agencies and, therefore, are already covered by

section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 794) ("section 504"), which prohibits discrimination on the basis of handicap in federally assisted programs and activities. Because title II of the ADA essentially extends the nondiscrimination mandate of section 504 to those State and local governments that do not receive Federal financial assistance, this rule hews closely to the provisions of existing section 504 regulations. This approach is also based on section 204 of the ADA, which provides that the regulations issued by the Attorney General to implement title II shall be consistent with the ADA and with the Department of Health, Education, and Welfare's coordination regulation, now codified at 28 CFR Part 41, and, with respect to "program accessibility, existing facilities," and "communications," with the Department of Justice's regulation for its federally conducted programs and activities, codified at 28 CFR Part 39.

The first regulation implementing section 504 was issued in 1977 by the Department of Health, Education, and Welfare (HEW) for the programs and activities to which it provided Federal financial assistance. The following year, pursuant to Executive Order 11914, HEW issued its coordination regulation for federally assisted programs, which served as the model for regulations issued by the other Federal agencies that administer grant programs. HEW's coordination authority, and the coordination regulation issued under that authority, were transferred to the Department of Justice by Executive Order 12250 in 1980.

In 1978, Congress extended application of section 504 to programs and activities conducted by Federal Executive agencies and the United States Postal Service. Pursuant to Executive Order 12250, the Department of Justice developed a prototype regulation to implement the 1978 amendment for federally conducted programs and activities. More than 80 Federal agencies have now issued final regulations based on that prototype, prohibiting discrimination based on handicap in the programs and activities they conduct.

Despite the large number of regulations implementing section 504 for federally assisted and federally conducted programs and activities, there is very little variation in their substantive requirements, or even in their language. Major portions of this regulation, therefore, are taken directly from the existing regulations.

In addition, section 204(b) of the ADA requires that the Department's regulation implementing subtitle A of title II be consistent with the ADA. Thus, the Department's final regulation includes provisions and concepts from titles I and III of the ADA.

*Rulemaking History.*

On February 22, 1991, the Department of Justice published a notice of proposed rulemaking (NPRM) implementing title III of the ADA in the *Federal Register*. 56 FR 7452. On February 28, 1991, the Department published a notice of proposed rulemaking implementing subtitle A of title II of the ADA in the *Federal Register*. 56 FR 8538. Each NPRM solicited comments on the definitions, standards, and procedures of the proposed rules. By the April 29, 1991, close of the comment period of the NPRM for title II, the Department had received 2,718 comments. Following the close of the comment period, the Department received an additional 222 comments.

In order to encourage public participation in the development of the Department's rules under the ADA, the Department held four public hearings. Hearings were held in Dallas, Texas on March 4-5, 1991, in Washington, D.C. on March 13-15, 1991, in San Francisco, California on March 18-19, 1991, and in Chicago, Illinois on March 27-28, 1991. At these hearings, 329 persons testified and 1,567 pages of testimony were compiled. Transcripts of the hearings were included in the Department's rulemaking

docket.

The comments that the Department received occupy almost six feet of shelf space and contain over 10,000 pages. The Department received comments from individuals from all fifty States and the District of Columbia. Nearly 75% of the comments that the Department received came from individuals and from organizations representing the interests of persons with disabilities. The Department received 292 comments from entities covered by the ADA and trade associations representing businesses in the private sector, and 67 from government units, such as mayors' offices, public school districts, and various State agencies working with individuals with disabilities.

The Department received one comment from a consortium of 540 organizations representing a broad spectrum of persons with disabilities. In addition, at least another 25 commenters endorsed the position expressed by this consortium, or submitted identical comments on one or both proposed regulations.

An organization representing persons with hearing impairments submitted a large number of comments. This organization presented the Department with 479 individual comments, each providing in chart form a detailed representation of what type of auxiliary aid or service would be useful in the various categories of places of public accommodation.

The Department received a number of comments based on almost ten different form letters. For example, individuals who have a heightened sensitivity to a variety of chemical substances submitted 266 post cards detailing how exposure to various environmental conditions restricts their access to public and commercial buildings. Another large group of form letters came from groups affiliated with independent living centers.

The vast majority of the comments addressed the Department's proposal implementing title III. Slightly more than 100 comments addressed only issues presented in the proposed title II regulation.

The Department read and analyzed each comment that was submitted in a timely fashion. Transcripts of the four hearings were analyzed along with the written comments. The decisions that the Department has made in response to these comments, however, were not made on the basis of the number of commenters addressing any one point but on a thorough consideration of the merits of the points of view expressed in the comments. Copies of the written comments, including transcripts of the four hearings, will remain available for public inspection in Room 854 of the HOLC Building, 320 First Street, N.W., Washington, D.C. from 10:00 a.m. to 5:00 p.m., Monday through Friday, except for legal holidays, until August 30, 1991.

*Overview of the Rule.*

The rule is organized into seven subparts. Subpart A, "General," includes the purpose and application sections, describes the relationship of the Act to other laws, and defines key terms used in the regulation. It also includes administrative requirements adapted from section 504 regulations for self- evaluations, notices, designation of responsible employees, and adoption of grievance procedures by public entities.

Subpart B, "General Requirements," contains the general prohibitions of discrimination based on the Act and the section 504 regulations. It also contains certain "miscellaneous" provisions derived from title V of the Act that involve issues such as retaliation and coercion against those asserting ADA rights, illegal use of drugs, and restrictions on smoking. These provisions are also included in the Department's proposed title III regulation, as is the general provision on maintenance of accessible features.

Subpart C addresses employment by public entities, which is also covered by title I of the Act. Subpart D, which is also based on the section 504 regulations, sets out the requirements for program accessibility in existing facilities and for new construction and alterations. Subpart E contains specific requirements relating to communications.

Subpart F establishes administrative procedures for enforcement of title II. As provided by section 203 of the Act, these are based on the procedures for enforcement of section 504, which, in turn, are based on the enforcement procedures for title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d to 2000d-4a). Subpart F also restates the provisions of title V of the ADA on attorneys fees, alternative means of dispute resolution, the effect of unavailability of technical assistance, and State immunity.

Subpart G designates the Federal agencies responsible for investigation of complaints under this part. It assigns enforcement responsibility for particular public entities, on the basis of their major functions, to eight Federal agencies that currently have substantial responsibilities for enforcing section 504. It provides that the Department of Justice would have enforcement responsibility for all State and local government entities not specifically assigned to other designated agencies, but that the Department may further assign specific functions to other agencies. The part would not, however, displace the existing enforcement authorities of the Federal funding agencies under section 504.

*Regulatory Process Matters.*

This final rule has been reviewed by the Office of Management and Budget under Executive Order 12291. The Department is preparing a final regulatory impact analysis (RIA) of this rule and the Architectural and Transportation Barriers Compliance Board is preparing an RIA for its Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG) that are incorporated in Appendix A of the Department's final rule implementing title III of the ADA. Draft copies of both preliminary RIAs are available for comment; the Department will provide copies of these documents to the public upon request. Commenters are urged to provide additional information as to the costs and benefits associated with this rule. This will facilitate the development of a final RIA by January 1, 1992.

The Department's RIA will evaluate the economic impact of the final rule. Included among those title II provisions that are likely to result in significant economic impact are the requirements for auxiliary aids, barrier removal in existing facilities, and readily accessible new construction and alterations. An analysis of these costs will be included in the RIA.

The Preliminary RIA prepared for the notice of proposed rulemaking contained all of the available information that would have been included in a preliminary regulatory flexibility analysis, had one been prepared under the Regulatory Flexibility Act, concerning the rule's impact on small entities. The final RIA will contain all of the information that is required in a final regulatory flexibility analysis and will serve as such an analysis. Moreover, the extensive notice and comment procedure followed by the Department in the promulgation of this rule, which included public hearings, dissemination of materials, and provision of speakers to affected groups, clearly provided any interested small entities with the notice and opportunity for comment provided for under the Regulatory Flexibility Act procedures.

The Department is preparing a statement of the federalism impact of the rule under Executive Order 12612 and will provide copies of this statement on request.

The reporting and recordkeeping requirements described in the rule are considered to be information collection requirements as that term is defined by the Office of Management and Budget in 5 CFR Part 1320. Accordingly, those information collection requirements have been submitted to OMB for review

pursuant to the Paperwork Reduction Act.

## SECTION-BY-SECTION ANALYSIS:

**Subpart A -- General**

**{35.101 Purpose.**

Section 35.101 states the purpose of the rule, which is to effectuate subtitle A of title II of the Americans with Disabilities Act of 1990 (the Act), which prohibits discrimination on the basis of disability by public entities. This part does not, however, apply to matters within the scope of the authority of the Secretary of Transportation under subtitle B of title II of the Act.

**{35.102 Application.**

This provision specifies that, except as provided in paragraph (b), the regulation applies to all services, programs, and activities provided or made available by public entities, as that term is defined in {35.104. Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), which prohibits discrimination on the basis of handicap in federally assisted programs and activities, already covers those programs and activities of public entities that receive Federal financial assistance. Title II of the ADA extends this prohibition of discrimination to include all services, programs, and activities provided or made available by State and local governments or any of their instrumentalities or agencies, regardless of the receipt of Federal financial assistance. Except as provided in {35.134, this part does not apply to private entities.

The scope of title II's coverage of public entities is comparable to the coverage of Federal Executive agencies under the 1978 amendment to section 504, which extended section 504's application to all programs and activities "conducted by" Federal Executive agencies, in that title II applies to anything a public entity does. Title II coverage, however, is not limited to "Executive" agencies, but includes activities of the legislative and judicial branches of State and local governments. All governmental activities of public entities are covered, even if they are carried out by contractors. For example, a State is obligated by title II to ensure that the services, programs, and activities of a State park inn operated under contract by a private entity are in compliance with title II's requirements. The private entity operating the inn would also be subject to the obligations of public accommodations under title III of the Act and the Department's title III regulations at 28 CFR Part 36.

Aside from employment, which is also covered by title I of the Act, there are two major categories of programs or activities covered by this regulation: those involving general public contact as part of ongoing operations of the entity and those directly administered by the entities for program beneficiaries and participants. Activities in the first category include communication with the public (telephone contacts, office walk-ins, or interviews) and the public's use of the entity's facilities. Activities in the second category include programs that provide State or local government services or benefits.

Paragraph (b) of {35.102 explains that to the extent that the public transportation services, programs, and activities of public entities are covered by subtitle B of title II of the Act, they are subject to the regulation of the Department of Transportation (DOT) at 49 CFR Part 37, and are not covered by this part. The Department of Transportation's ADA regulation establishes specific requirements for construction of transportation facilities and acquisition of vehicles. Matters not covered by subtitle B, such as the provision of auxiliary aids, are covered by this rule. For example, activities that are covered by the Department of Transportation's regulation implementing subtitle B are not required to be included in the self-evaluation required by {35.105. In addition, activities not specifically addressed by DOT's

ADA regulation may be covered by DOT's regulation implementing section 504 for its federally assisted programs and activities at 49 CFR Part 27. Like other programs of public entities that are also recipients of Federal financial assistance, those programs would be covered by both the section 504 regulation and this part. Although airports operated by public entities are not subject to DOT's ADA regulation, they are subject to subpart A of title II and to this rule.

Some commenters asked for clarification about the responsibilities of public school systems under section 504 and the ADA with respect to programs, services, and activities that are not covered by the Individuals with Disabilities Education Act (IDEA), including, for example, programs open to parents or to the public, graduation ceremonies, parent-teacher organization meetings, plays and other events open to the public, and adult education classes. Public school systems must comply with the ADA in all of their services, programs, or activities, including those that are open to parents or to the public. For instance, public school systems must provide program accessibility to parents and guardians with disabilities to these programs, activities, or services, and appropriate auxiliary aids and services whenever necessary to ensure effective communication, as long as the provision of the auxiliary aids results neither in an undue burden or in a fundamental alteration of the program.

{35.103 Relationship to other laws.

Section 35.103 is derived from sections 501(a) and (b) of the ADA. Paragraph (a) of this section provides that, except as otherwise specifically provided by this part, title II of the ADA is not intended to apply lesser standards than are required under title V of the Rehabilitation Act of 1973, as amended (29 U.S.C. 790-94), or the regulations implementing that title. The standards of title V of the Rehabilitation Act apply for purposes of the ADA to the extent that the ADA has not explicitly adopted a different standard than title V. Because title II of the ADA essentially extends the antidiscrimination prohibition embodied in section 504 to all actions of State and local governments, the standards adopted in this part are generally the same as those required under section 504 for federally assisted programs. Title II, however, also incorporates those provisions of titles I and III of the ADA that are not inconsistent with the regulations implementing section 504. Judiciary Committee report, H.R. Rep. No. 485, 101st Cong., 2d Sess., pt.3, at 51 (1990) [hereinafter "Judiciary report"]; Education and Labor Committee report, H.R. Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 84 (1990) [hereinafter "Education and Labor report"]. Therefore, this part also includes appropriate provisions derived from the regulations implementing those titles. The inclusion of specific language in this part, however, should not be interpreted as an indication that a requirement is not included under a regulation implementing section 504.

Paragraph (b) makes clear that Congress did not intend to displace any of the rights or remedies provided by other Federal laws (including section 504) or other State laws (including State common law) that provide greater or equal protection to individuals with disabilities. As discussed above, the standards adopted by title II of the ADA for State and local government services are generally the same as those required under section 504 for federally assisted programs and activities. Subpart F of the regulation establishes compliance procedures for processing complaints covered by both this part and section 504.

With respect to State law, a plaintiff may choose to pursue claims under a State law that does not confer greater substantive rights, or even confers fewer substantive rights, if the alleged violation is protected under the alternative law and the remedies are greater. For example, a person with a physical disability could seek damages under a State law that allows compensatory and punitive damages for discrimination on the basis of physical disability, but not on the basis of mental disability. In that situation, the State law would provide narrower coverage, by excluding mental disabilities, but broader

remedies, and an individual covered by both laws could choose to bring an action under both laws. Moreover, State tort claims confer greater remedies and are not preempted by the ADA. A plaintiff may join a State tort claim to a case brought under the ADA. In such a case, the plaintiff must, of course, prove all the elements of the State tort claim in order to prevail under that cause of action.

**{35.104 Definitions.**

"Act." The word "Act" is used in this part to refer to the Americans with Disabilities Act of 1990, Pub. L. 101-336, which is also referred to as the "ADA."

"Assistant Attorney General." The term "Assistant Attorney General" refers to the Assistant Attorney General of the Civil Rights Division of the Department of Justice.

"Auxiliary aids and services." Auxiliary aids and services include a wide range of services and devices for ensuring effective communication. The proposed definition in {35.104 provided a list of examples of auxiliary aids and services that was taken from the definition of auxiliary aids and services in section 3 (1) of the ADA and was supplemented by examples from regulations implementing section 504 in federally conducted programs (see 28 CFR 39.103).

A substantial number of commenters suggested that additional examples be added to this list. The Department has added several items to this list but wishes to clarify that the list is not an all-inclusive or exhaustive catalogue of possible or available auxiliary aids or services. It is not possible to provide an exhaustive list, and an attempt to do so would omit the new devices that will become available with emerging technology.

Subparagraph (1) lists several examples, which would be considered auxiliary aids and services to make aurally delivered materials available to individuals with hearing impairments. The Department has changed the phrase used in the proposed rules, "orally delivered materials," to the statutory phrase, "aurally delivered materials," to track section 3 of the ADA and to include non-verbal sounds and alarms, and computer generated speech.

The Department has added videotext displays, transcription services, and closed and open captioning to the list of examples. Videotext displays have become an important means of accessing auditory communications through a public address system. Transcription services are used to relay aurally delivered material almost simultaneously in written form to persons who are deaf or hearing-impaired. This technology is often used at conferences, conventions, and hearings. While the proposed rule expressly included television decoder equipment as an auxiliary aid or service, it did not mention captioning itself. The final rule rectifies this omission by mentioning both closed and open captioning.

Several persons and organizations requested that the Department replace the term "telecommunications devices for deaf persons" or "TDD's" with the term "text telephone." The Department has declined to do so. The Department is aware that the Architectural and Transportation Barriers Compliance Board (ATBCB) has used the phrase "text telephone" in lieu of the statutory term "TDD" in its final accessibility guidelines. Title IV of the ADA, however, uses the term "Telecommunications Device for the Deaf" and the Department believes it would be inappropriate to abandon this statutory term at this time.

Several commenters urged the Department to include in the definition of "auxiliary aids and services" devices that are now available or that may become available with emerging technology. The Department declines to do so in the rule. The Department, however, emphasizes that, although the definition would

include "state of the art" devices, public entities are not required to use the newest or most advanced technologies as long as the auxiliary aid or service that is selected affords effective communication.

Subparagraph (2) lists examples of aids and services for making visually delivered materials accessible to persons with visual impairments. Many commenters proposed additional examples, such as signage or mapping, audio description services, secondary auditory programs, telebraillers, and reading machines. While the Department declines to add these items to the list, they are auxiliary aids and services and may be appropriate depending on the circumstances.

Subparagraph (3) refers to acquisition or modification of equipment or devices. Several commenters suggested the addition of current technological innovations in microelectronics and computerized control systems (e.g., voice recognition systems, automatic dialing telephones, and infrared elevator and light control systems) to the list of auxiliary aids. The Department interprets auxiliary aids and services as those aids and services designed to provide effective communications, i.e., making aurally and visually delivered information available to persons with hearing, speech, and vision impairments. Methods of making services, programs, or activities accessible to, or usable by, individuals with mobility or manual dexterity impairments are addressed by other sections of this part, including the provision for modifications in policies, practices, or procedures ({35.130(b)(7)).

Paragraph (b)(4) deals with other similar services and actions. Several commenters asked for clarification that "similar services and actions" include retrieving items from shelves, assistance in reaching a marginally accessible seat, pushing a barrier aside in order to provide an accessible route, or assistance in removing a sweater or coat. While retrieving an item from a shelf might be an "auxiliary aid or service" for a blind person who could not locate the item without assistance, it might be a method of providing program access for a person using a wheelchair who could not reach the shelf, or a reasonable modification to a self-service policy for an individual who lacked the ability to grasp the item. As explained above, auxiliary aids and services are those aids and services required to provide effective communications. Other forms of assistance are more appropriately addressed by other provisions of the final rule.

"Complete complaint." "Complete complaint" is defined to include all the information necessary to enable the Federal agency designated under subpart G as responsible for investigation of a complaint to initiate its investigation.

"Current illegal use of drugs." The phrase "current illegal use of drugs" is used in {35.131. Its meaning is discussed in the preamble for that section.

"Designated agency." The term "designated agency" is used to refer to the Federal agency designated under subpart G of this rule as responsible for carrying out the administrative enforcement responsibilities established by subpart F of the rule.

"Disability." The definition of the term "disability" is the same as the definition in the title III regulation codified at 28 CFR Part 36. It is comparable to the definition of the term "individual with handicaps" in section 7(8) of the Rehabilitation Act and section 802(h) of the Fair Housing Act. The Education and Labor Committee report makes clear that the analysis of the term "individual with handicaps" by the Department of Health, Education, and Welfare (HEW) in its regulations implementing section 504 (42 FR 22685 (May 4, 1977)) and the analysis by the Department of Housing and Urban Development in its regulation implementing the Fair Housing Amendments Act of 1988 (54 FR 3232 (Jan. 23, 1989)) should also apply fully to the term "disability" (Education and Labor report at 50).

The use of the term "disability" instead of "handicap" and the term "individual with a disability" instead of "individual with handicaps" represents an effort by Congress to make use of up-to-date, currently accepted terminology. As with racial and ethnic epithets, the choice of terms to apply to a person with a disability is overlaid with stereotypes, patronizing attitudes, and other emotional connotations. Many individuals with disabilities, and organizations representing such individuals, object to the use of such terms as "handicapped person" or "the handicapped." In other recent legislation, Congress also recognized this shift in terminology, e.g., by changing the name of the National Council on the Handicapped to the National Council on Disability (Pub. L. 100- 630).

In enacting the Americans with Disabilities Act, Congress concluded that it was important for the current legislation to use terminology most in line with the sensibilities of most Americans with disabilities. No change in definition or substance is intended nor should one be attributed to this change in phraseology.

The term "disability" means, with respect to an individual -

(A) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) A record of such an impairment; or

(C) Being regarded as having such an impairment.

If an individual meets any one of these three tests, he or she is considered to be an individual with a disability for purposes of coverage under the Americans with Disabilities Act.

Congress adopted this same basic definition of "disability," first used in the Rehabilitation Act of 1973 and in the Fair Housing Amendments Act of 1988, for a number of reasons. First, it has worked well since it was adopted in 1974. Second, it would not be possible to guarantee comprehensiveness by providing a list of specific disabilities, especially because new disorders may be recognized in the future, as they have since the definition was first established in 1974.

Test A -- A physical or mental impairment that substantially limits one or more of the major life activities of such individual

*Physical or mental impairment.* Under the first test, an individual must have a physical or mental impairment. As explained in paragraph (1)(i) of the definition, "impairment" means any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs (which would include speech organs that are not respiratory such as vocal cords, soft palate, tongue, etc.); respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine. It also means any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. This list closely tracks the one used in the regulations for section 504 of the Rehabilitation Act of 1973 (see, *e.g.*, 45 CFR 84.3(j)(2)(i)).

Many commenters asked that "traumatic brain injury" be added to the list in paragraph (1)(i). Traumatic brain injury is already included because it is a physiological condition affecting one of the listed body systems, i.e., "neurological." Therefore, it was unnecessary to add the term to the regulation, which only provides representative examples of physiological disorders.

It is not possible to include a list of all the specific conditions, contagious and noncontagious diseases, or infections that would constitute physical or mental impairments because of the difficulty of ensuring the comprehensiveness of such a list, particularly in light of the fact that other conditions or disorders may be identified in the future. However, the list of examples in paragraph (1)(ii) of the definition includes: orthopedic, visual, speech and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease (symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism. The phrase "symptomatic or asymptomatic" was inserted in the final rule after "HIV disease" in response to commenters who suggested the clarification was necessary.

The examples of "physical or mental impairments" in paragraph (1)(ii) are the same as those contained in many section 504 regulations, except for the addition of the phrase "contagious and noncontagious" to describe the types of diseases and conditions included, and the addition of "HIV disease (symptomatic or asymptomatic)" and "tuberculosis" to the list of examples. These additions are based on the committee reports, caselaw, and official legal opinions interpreting section 504. In *School Board of Nassau County v. Arline, 480 U.S. 273 (1987)*, a case involving an individual with tuberculosis, the Supreme Court held that people with contagious diseases are entitled to the protections afforded by section 504. Following the *Arline* decision, this Department's Office of Legal Counsel issued a legal opinion that concluded that symptomatic HIV disease is an impairment that substantially limits a major life activity; therefore it has been included in the definition of disability under this part. The opinion also concluded that asymptomatic HIV disease is an impairment that substantially limits a major life activity, either because of its actual effect on the individual with HIV disease or because the reactions of other people to individuals with HIV disease cause such individuals to be treated as though they are disabled. *See* Memorandum from Douglas W. Kmiec, Acting Assistant Attorney General, Office of Legal Counsel, Department of Justice, to Arthur B. Culvahouse, Jr., Counsel to the President (Sept. 27, 1988), reprinted in Hearings on S. 933, the Americans with Disabilities Act, Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Human Resources, 101st. Cong., 1st Sess. 346 (1989).

Paragraph (1)(iii) states that the phrase "physical or mental impairment" does not include homosexuality or bisexuality. These conditions were never considered impairments under other Federal disability laws. Section 511(a) of the statute makes clear that they are likewise not to be considered impairments under the Americans with Disabilities Act.

Physical or mental impairment does not include simple physical characteristics, such as blue eyes or black hair. Nor does it include environmental, cultural, economic, or other disadvantages, such as having a prison record, or being poor. Nor is age a disability. Similarly, the definition does not include common personality traits such as poor judgment or a quick temper where these are not symptoms of a mental or psychological disorder. However, a person who has these characteristics and also has a physical or mental impairment may be considered as having a disability for purposes of the Americans with Disabilities Act based on the impairment.

*Substantial limitation of a major life activity.* Under Test A, the impairment must be one that "substantially limits a major life activity." Major life activities include such things as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

For example, a person who is paraplegic is substantially limited in the major life activity of walking, a person who is blind is substantially limited in the major life activity of seeing, and a person who is mentally retarded is substantially limited in the major life activity of learning. A person with traumatic brain injury is substantially limited in the major life activities of caring for one's self, learning, and working because of memory deficit, confusion, contextual difficulties, and inability to reason

appropriately.

A person is considered an individual with a disability for purposes of Test A, the first prong of the definition, when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people. A person with a minor, trivial impairment, such as a simple infected finger, is not impaired in a major life activity. A person who can walk for 10 miles continuously is not substantially limited in walking merely because, on the eleventh mile, he or she begins to experience pain, because most people would not be able to walk eleven miles without experiencing some discomfort.

The Department received many comments on the proposed rule's inclusion of the word "temporary" in the definition of "disability." The preamble indicated that impairments are not necessarily excluded from the definition of "disability" simply because they are temporary, but that the duration, or expected duration, of an impairment is one factor that may properly be considered in determining whether the impairment substantially limits a major life activity. The preamble recognized, however, that temporary impairments, such as a broken leg, are not commonly regarded as disabilities, and only in rare circumstances would the degree of the limitation and its expected duration be substantial. Nevertheless, many commenters objected to inclusion of the word "temporary" both because it is not in the statute and because it is not contained in the definition of "disability" set forth in the title I regulations of the Equal Employment Opportunity Commission (EEOC). The word "temporary" has been deleted from the final rule to conform with the statutory language.

The question of whether a temporary impairment is a disability must be resolved on a case-by-case basis, taking into consideration both the duration (or expected duration) of the impairment and the extent to which it actually limits a major life activity of the affected individual.

The question of whether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable modifications or auxiliary aids and services. For example, a person with hearing loss is substantially limited in the major life activity of hearing, even though the loss may be improved through the use of a hearing aid. Likewise, persons with impairments, such as epilepsy or diabetes, that substantially limit a major life activity, are covered under the first prong of the definition of disability, even if the effects of the impairment are controlled by medication.

Many commenters asked that environmental illness (also known as multiple chemical sensitivity) as well as allergy to cigarette smoke be recognized as disabilities. The Department, however, declines to state categorically that these types of allergies or sensitivities are disabilities, because the determination as to whether an impairment is a disability depends on whether, given the particular circumstances at issue, the impairment substantially limits one or more major life activities (or has a history of, or is regarded as having such an effect).

Sometimes respiratory or neurological functioning is so severely affected that an individual will satisfy the requirements to be considered disabled under the regulation. Such an individual would be entitled to all of the protections afforded by the Act and this part. In other cases, individuals may be sensitive to environmental elements or to smoke but their sensitivity will not rise to the level needed to constitute a disability. For example, their major life activity of breathing may be somewhat, but not substantially, impaired. In such circumstances, the individuals are not disabled and are not entitled to the protections of the statute despite their sensitivity to environmental agents.

In sum, the determination as to whether allergies to cigarette smoke, or allergies or sensitivities characterized by the commenters as environmental illness are disabilities covered by the regulation must

be made using the same case-by-case analysis that is applied to all other physical or mental impairments. Moreover, the addition of specific regulatory provisions relating to environmental illness in the final rule would be inappropriate at this time pending future consideration of the issue by the Architectural and Transportation Barriers Compliance Board, the Environmental Protection Agency, and the Occupational Safety and Health Administration of the Department of Labor.

Test B -- A record of such an impairment

This test is intended to cover those who have a record of an impairment. As explained in paragraph (3) of the rule's definition of disability, this includes a person who has a history of an impairment that substantially limited a major life activity, such as someone who has recovered from an impairment. It also includes persons who have been misclassified as having an impairment.

This provision is included in the definition in part to protect individuals who have recovered from a physical or mental impairment that previously substantially limited them in a major life activity. Discrimination on the basis of such a past impairment is prohibited. Frequently occurring examples of the first group (those who have a history of an impairment) are persons with histories of mental or emotional illness, heart disease, or cancer; examples of the second group (those who have been misclassified as having an impairment) are persons who have been misclassified as having mental retardation or mental illness.

Test C -- Being regarded as having such an impairment

This test, as contained in paragraph (4) of the definition, is intended to cover persons who are treated by a public entity as having a physical or mental impairment that substantially limits a major life activity. It applies when a person is treated as if he or she has an impairment that substantially limits a major life activity, regardless of whether that person has an impairment.

The Americans with Disabilities Act uses the same "regarded as" test set forth in the regulations implementing section 504 of the Rehabilitation Act. *See, e.g.*, 28 CFR 42.540(k)(2)(iv), which provides:

> (iv) "Is regarded as having an impairment" means (A) Has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation; (B) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (C) Has none of the impairments defined in paragraph (k)(2)(i) of this section but is treated by a recipient as having such an impairment.

The perception of the covered entity is a key element of this test. A person who perceives himself or herself to have an impairment, but does not have an impairment, and is not treated as if he or she has an impairment, is not protected under this test.

A person would be covered under this test if a public entity refused to serve the person because it perceived that the person had an impairment that limited his or her enjoyment of the goods or services being offered.

For example, persons with severe burns often encounter discrimination in community activities, resulting in substantial limitation of major life activities. These persons would be covered under this test based on the attitudes of others towards the impairment, even if they did not view themselves as "impaired."

The rationale for this third test, as used in the Rehabilitation Act of 1973, was articulated by the Supreme Court in *Arline*, 480 U.S. 273 (1987). The Court noted that although an individual may have an impairment that does not in fact substantially limit a major life activity, the reaction of others may prove just as disabling. "Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment." *Id.* at 283. The Court concluded that, by including this test in the Rehabilitation Act's definition, "Congress acknowledged that society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment." *Id.* at 284.

Thus, a person who is denied services or benefits by a public entity because of myths, fears, and stereotypes associated with disabilities would be covered under this third test whether or not the person's physical or mental condition would be considered a disability under the first or second test in the definition.

If a person is refused admittance on the basis of an actual or perceived physical or mental condition, and the public entity can articulate no legitimate reason for the refusal (such as failure to meet eligibility criteria), a perceived concern about admitting persons with disabilities could be inferred and the individual would qualify for coverage under the "regarded as" test. A person who is covered because of being regarded as having an impairment is not required to show that the public entity's perception is inaccurate (e.g., that he will be accepted by others) in order to receive benefits from the public entity.

Paragraph (5) of the definition lists certain conditions that are not included within the definition of "disability." The excluded conditions are: transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, other sexual behavior disorders, compulsive gambling, kleptomania, pyromania, and psychoactive substance use disorders resulting from current illegal use of drugs. Unlike homosexuality and bisexuality, which are not considered impairments under either section 504 or the Americans with Disabilities Act (see the definition of "disability," paragraph (1)(iv)), the conditions listed in paragraph (5), except for transvestism, are not necessarily excluded as impairments under section 504. (Transvestism was excluded from the definition of disability for section 504 by the Fair Housing Amendments Act of 1988, Pub. L. 100-430, section 6(b)).

"Drug." The definition of the term "drug" is taken from section 510(d)(2) of the ADA.

"Facility." "Facility" means all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located. It includes both indoor and outdoor areas where human-constructed improvements, structures, equipment, or property have been added to the natural environment.

Commenters raised questions about the applicability of this part to activities operated in mobile facilities, such as bookmobiles or mobile health screening units. Such activities would be covered by the requirement for program accessibility in {35.150, and would be included in the definition of "facility" as "other real or personal property," although standards for new construction and alterations of such facilities are not yet included in the accessibility standards adopted by {35.151. Sections 35.150 and 35.151 specifically address the obligations of public entities to ensure accessibility by providing curb ramps at pedestrian walkways.

"Historic preservation programs" and "Historic properties" are defined in order to aid in the

interpretation of {{35.150(a)(2) and (b)(2), which relate to accessibility of historic preservation programs, and {35.151(d), which relates to the alteration of historic properties.

"Illegal use of drugs." The definition of "illegal use of drugs" is taken from section 510(d)(1) of the Act and clarifies that the term includes the illegal use of one or more drugs.

"Individual with a disability" means a person who has a disability but does not include an individual who is currently illegally using drugs, when the public entity acts on the basis of such use. The phrase "current illegal use of drugs" is explained in {35.131.

"Public entity." The term "public entity" is defined in accordance with section 201(1) of the ADA as any State or local government; any department, agency, special purpose district, or other instrumentality of a State or States or local government; or the National Railroad Passenger Corporation, and any commuter authority (as defined in section 103(8) of the Rail Passenger Service Act).

"Qualified individual with a disability." The definition of "qualified individual with a disability" is taken from section 201(2) of the Act, which is derived from the definition of "qualified handicapped person" in the Department of Health and Human Services' regulation implementing section 504 (45 CFR {84.3 (k)). It combines the definition at 45 CFR 84.3(k)(1) for employment ("a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question") with the definition for other services at 45 CFR 84.3(k)(4) ("a handicapped person who meets the essential eligibility requirements for the receipt of such services").

Some commenters requested clarification of the term "essential eligibility requirements." Because of the variety of situations in which an individual's qualifications will be at issue, it is not possible to include more specific criteria in the definition. The "essential eligibility requirements" for participation in some activities covered under this part may be minimal. For example, most public entities provide information about their operations as a public service to anyone who requests it. In such situations, the only "eligibility requirement" for receipt of such information would be the request for it. Where such information is provided by telephone, even the ability to use a voice telephone is not an "essential eligibility requirement," because {35.161 requires a public entity to provide equally effective telecommunication systems for individuals with impaired hearing or speech.

For other activities, identification of the "essential eligibility requirements" may be more complex. Where questions of safety are involved, the principles established in {36.208 of the Department's regulation implementing title III of the ADA, to be codified at 28 CFR Part 36, will be applicable. That section implements section 302(b)(3) of the Act, which provides that a public accommodation is not required to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of the public accommodation, if that individual poses a direct threat to the health or safety of others.

A "direct threat" is a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services. In *School Board of Nassau County v. Arline, 480 U.S. 273 (1987)*, the Supreme Court recognized that there is a need to balance the interests of people with disabilities against legitimate concerns for public safety. Although persons with disabilities are generally entitled to the protection of this part, a person who poses a significant risk to others will not be "qualified," if reasonable modifications to the public entity's policies, practices, or procedures will not eliminate that risk.

The determination that a person poses a direct threat to the health or safety of others may not be based

on generalizations or stereotypes about the effects of a particular disability. It must be based on an individualized assessment, based on reasonable judgment that relies on current medical evidence or on the best available objective evidence, to determine: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk. This is the test established by the Supreme Court in *Arline*. Such an inquiry is essential if the law is to achieve its goal of protecting disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to legitimate concerns, such as the need to avoid exposing others to significant health and safety risks. Making this assessment will not usually require the services of a physician. Sources for medical knowledge include guidance from public health authorities, such as the U.S. Public Health Service, the Centers for Disease Control, and the National Institutes of Health, including the National Institute of Mental Health.

"Qualified interpreter." The Department received substantial comment regarding the lack of a definition of "qualified interpreter." The proposed rule defined auxiliary aids and services to include the statutory term, "qualified interpreters" ({35.104), but did not define it. Section 35.160 requires the use of auxiliary aids including qualified interpreters and commenters stated that a lack of guidance on what the term means would create confusion among those trying to secure interpreting services and often result in less than effective communication.

Many commenters were concerned that, without clear guidance on the issue of "qualified" interpreter, the rule would be interpreted to mean "available, rather than qualified" interpreters. Some claimed that few public entities would understand the difference between a qualified interpreter and a person who simply knows a few signs or how to fingerspell.

In order to clarify what is meant by "qualified interpreter" the Department has added a definition of the term to the final rule. A qualified interpreter means an interpreter who is able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary. This definition focuses on the actual ability of the interpreter in a particular interpreting context to facilitate effective communication between the public entity and the individual with disabilities.

Public comment also revealed that public entities have at times asked persons who are deaf to provide family members or friends to interpret. In certain circumstances, notwithstanding that the family member of friend is able to interpret or is a certified interpreter, the family member or friend may not be qualified to render the necessary interpretation because of factors such as emotional or personal involvement or considerations of confidentiality that may adversely affect the ability to interpret "effectively, accurately, and impartially."

The definition of "qualified interpreter" in this rule does not invalidate or limit standards for interpreting services of any State or local law that are equal to or more stringent than those imposed by this definition. For instance, the definition would not supersede any requirement of State law for use of a certified interpreter in court proceedings.

"Section 504." The Department added a definition of "section 504" because the term is used extensively in subpart F of this part.

"State." The definition of "State" is identical to the statutory definition in section 3(3) of the ADA.

{35.105 Self-evaluation.

Section 35.105 establishes a requirement, based on the section 504 regulations for federally assisted and federally conducted programs, that a public entity evaluate its current policies and practices to identify and correct any that are not consistent with the requirements of this part. As noted in the discussion of {35.102, activities covered by the Department of Transportation's regulation implementing subtitle B of title II are not required to be included in the self-evaluation required by this section.

Experience has demonstrated the self-evaluation process to be a valuable means of establishing a working relationship with individuals with disabilities, which has promoted both effective and efficient implementation of section 504. The Department expects that it will likewise be useful to public entities newly covered by the ADA.

All public entities are required to do a self-evaluation. However, only those that employ 50 or more persons are required to maintain the self- evaluation on file and make it available for public inspection for three years. The number 50 was derived from the Department of Justice's section 504 regulations for federally assisted programs, 28 CFR 42.505(c). The Department received comments critical of this limitation, some suggesting the requirement apply to all public entities and others suggesting that the number be changed from 50 to 15. The final rule has not been changed. Although many regulations implementing section 504 for federally assisted programs do use 15 employees as the cut-off for this record-keeping requirement, the Department believes that it would be inappropriate to extend it to those smaller public entities covered by this regulation that do not receive Federal financial assistance. This approach has the benefit of minimizing paperwork burdens on small entities.

Paragraph (d) provides that the self-evaluation required by this section shall apply only to programs not subject to section 504 or those policies and practices, such as those involving communications access, that have not already been included in a self-evaluation required under an existing regulation implementing section 504. Because most self-evaluations were done from five to twelve years ago, however, the Department expects that a great many public entities will be reexamining all of their policies and programs. Programs and functions may have changed, and actions that were supposed to have been taken to comply with section 504 may not have been fully implemented or may no longer be effective. In addition, there have been statutory amendments to section 504 which have changed the coverage of section 504, particularly the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988), which broadened the definition of a covered "program or activity."

Several commenters suggested that the Department clarify public entities' liability during the one-year period for compliance with the self-evaluation requirement. The self-evaluation requirement does not stay the effective date of the statute nor of this part. Public entities are, therefore, not shielded from discrimination claims during that time.

Other commenters suggested that the rule require that every self-evaluation include an examination of training efforts to assure that individuals with disabilities are not subjected to discrimination because of insensitivity, particularly in the law enforcement area. Although the Department has not added such a specific requirement to the rule, it would be appropriate for public entities to evaluate training efforts because, in many cases, lack of training leads to discriminatory practices, even when the policies in place are nondiscriminatory.

{35.106 Notice.

Section 35.106 requires a public entity to disseminate sufficient information to applicants, participants, beneficiaries, and other interested persons to inform them of the rights and protections afforded by the ADA and this regulation. Methods of providing this information include, for example, the publication of

information in handbooks, manuals, and pamphlets that are distributed to the public to describe a public entity's programs and activities; the display of informative posters in service centers and other public places; or the broadcast of information by television or radio. In providing the notice, a public entity must comply with the requirements for effective communication in {35.160. The preamble to that section gives guidance on how to effectively communicate with individuals with disabilities.

### {35.107 Designation of responsible employee and adoption of grievance procedures.

Consistent with {35.105, Self-evaluation, the final rule requires that public entities with 50 or more employees designate a responsible employee and adopt grievance procedures. Most of the commenters who suggested that the requirement that self-evaluation be maintained on file for three years not be limited to those employing 50 or more persons made a similar suggestion concerning {35.107. Commenters recommended either that all public entities be subject to section 35.107, or that "50 or more persons" be changed to "15 or more persons." As explained in the discussion of {35.105, the Department has not adopted this suggestion.

The requirement for designation of an employee responsible for coordination of efforts to carry out responsibilities under this part is derived from the HEW regulation implementing section 504 in federally assisted programs. The requirement for designation of a particular employee and dissemination of information about how to locate that employee helps to ensure that individuals dealing with large agencies are able to easily find a responsible person who is familiar with the requirements of the Act and this part and can communicate those requirements to other individuals in the agency who may be unaware of their responsibilities. This paragraph in no way limits a public entity's obligation to ensure that all of its employees comply with the requirements of this part, but it ensures that any failure by individual employees can be promptly corrected by the designated employee.

Section 35.107(b) requires public entities with 50 or more employees to establish grievance procedures for resolving complaints of violations of this part. Similar requirements are found in the section 504 regulations for federally assisted programs (see, e.g., 45 CFR 84.7(b)). The rule, like the regulations for federally assisted programs, provides for investigation and resolution of complaints by a Federal enforcement agency. It is the view of the Department that public entities subject to this part should be required to establish a mechanism for resolution of complaints at the local level without requiring the complainant to resort to the Federal complaint procedures established under subpart F. Complainants would not, however, be required to exhaust the public entity's grievance procedures before filing a complaint under subpart F. Delay in filing the complaint at the Federal level caused by pursuit of the remedies available under the grievance procedure would generally be considered good cause for extending the time allowed for filing under {35.170(b).

### Subpart B -- General Requirements

### {35.130 General prohibitions against discrimination.

The general prohibitions against discrimination in the rule are generally based on the prohibitions in existing regulations implementing section 504 and, therefore, are already familiar to State and local entities covered by section 504. In addition, {35.130 includes a number of provisions derived from title III of the Act that are implicit to a certain degree in the requirements of regulations implementing section 504.

Several commenters suggested that this part should include the section of the proposed title III regulation that implemented section 309 of the Act, which requires that courses and examinations

related to applications, licensing, certification, or credentialing be provided in an accessible place and manner or that alternative accessible arrangements be made. The Department has not adopted this suggestion. The requirements of this part, including the general prohibitions of discrimination in this section, the program access requirements of subpart D, and the communications requirements of subpart E, apply to courses and examinations provided by public entities. The Department considers these requirements to be sufficient to ensure that courses and examinations administered by public entities meet the requirements of section 309. For example, a public entity offering an examination must ensure that modifications of policies, practices, or procedures or the provision of auxiliary aids and services furnish the individual with a disability an equal opportunity to demonstrate his or her knowledge or ability. Also, any examination specially designed for individuals with disabilities must be offered as often and in as timely a manner as are other examinations. Further, under this part, courses and examinations must be offered in the most integrated setting appropriate. The analysis of {35.130(d) is relevant to this determination.

A number of commenters asked that the regulation be amended to require training of law enforcement personnel to recognize the difference between criminal activity and the effects of seizures or other disabilities such as mental retardation, cerebral palsy, traumatic brain injury, mental illness, or deafness. Several disabled commenters gave personal statements about the abuse they had received at the hands of law enforcement personnel. Two organizations that commented cited the Judiciary report at 50 as authority to require law enforcement training.

The Department has not added such a training requirement to the regulation. Discriminatory arrests and brutal treatment are already unlawful police activities. The general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities. Under this section law enforcement personnel would be required to make appropriate efforts to determine whether perceived strange or disruptive behavior or unconsciousness is the result of a disability. The Department notes that a number of States have attempted to address the problem of arresting disabled persons for noncriminal conduct resulting from their disability through adoption of the Uniform Duties to Disabled Persons Act, and encourages other jurisdictions to consider that approach.

Paragraph (a) restates the nondiscrimination mandate of section 202 of the ADA. The remaining paragraphs in {35.130 establish the general principles for analyzing whether any particular action of the public entity violates this mandate.

Paragraph (b) prohibits overt denials of equal treatment of individuals with disabilities. A public entity may not refuse to provide an individual with a disability with an equal opportunity to participate in or benefit from its program simply because the person has a disability.

Paragraph (b)(1)(i) provides that it is discriminatory to deny a person with a disability the right to participate in or benefit from the aid, benefit, or service provided by a public entity. Paragraph (b)(1)(ii) provides that the aids, benefits, and services provided to persons with disabilities must be equal to those provided to others, and paragraph (b)(1)(iii) requires that the aids, benefits, or services provided to individuals with disabilities must be as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as those provided to others. These paragraphs are taken from the regulations implementing section 504 and simply restate principles long established under section 504.

Paragraph (b)(1)(iv) permits the public entity to develop separate or different aids, benefits, or services when necessary to provide individuals with disabilities with an equal opportunity to participate in or

benefit from the public entity's programs or activities, but only when necessary to ensure that the aids, benefits, or services are as effective as those provided to others. Paragraph (b)(1)(iv) must be read in conjunction with paragraphs (b)(2), (d), and (e). Even when separate or different aids, benefits, or services would be more effective, paragraph (b)(2) provides that a qualified individual with a disability still has the right to choose to participate in the program that is not designed to accommodate individuals with disabilities. Paragraph (d) requires that a public entity administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

Paragraph (b)(2) specifies that, notwithstanding the existence of separate or different programs or activities provided in accordance with this section, an individual with a disability shall not be denied the opportunity to participate in such programs or activities that are not separate or different. Paragraph (e), which is derived from section 501(d) of the Americans with Disabilities Act, states that nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit that he or she chooses not to accept.

Taken together, these provisions are intended to prohibit exclusion and segregation of individuals with disabilities and the denial of equal opportunities enjoyed by others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities. Consistent with these standards, public entities are required to ensure that their actions are based on facts applicable to individuals and not on presumptions as to what a class of individuals with disabilities can or cannot do.

Integration is fundamental to the purposes of the Americans with Disabilities Act. Provision of segregated accommodations and services relegates persons with disabilities to second-class status. For example, it would be a violation of this provision to require persons with disabilities to eat in the back room of a government cafeteria or to refuse to allow a person with a disability the full use of recreation or exercise facilities because of stereotypes about the person's ability to participate.

Many commenters objected to proposed paragraphs (b)(1)(iv) and (d) as allowing continued segregation of individuals with disabilities. The Department recognizes that promoting integration of individuals with disabilities into the mainstream of society is an important objective of the ADA and agrees that, in most instances, separate programs for individuals with disabilities will not be permitted. Nevertheless, section 504 does permit separate programs in limited circumstances, and Congress clearly intended the regulations issued under title II to adopt the standards of section 504. Furthermore, Congress included authority for separate programs in the specific requirements of title III of the Act. Section 302(b)(1)(A)(iii) of the Act provides for separate benefits in language similar to that in {35.130(b)(1)(iv), and section 302(b)(1)(B) includes the same requirement for "the most integrated setting appropriate" as in {35.130 (d).

Even when separate programs are permitted, individuals with disabilities cannot be denied the opportunity to participate in programs that are not separate or different. This is an important and overarching principle of the Americans with Disabilities Act. Separate, special, or different programs that are designed to provide a benefit to persons with disabilities cannot be used to restrict the participation of persons with disabilities in general, integrated activities.

For example, a person who is blind may wish to decline participating in a special museum tour that allows persons to touch sculptures in an exhibit and instead tour the exhibit at his or her own pace with the museum's recorded tour. It is not the intent of this section to require the person who is blind to avail himself or herself of the special tour. Modified participation for persons with disabilities must be a choice, not a requirement.

In addition, it would not be a violation of this section for a public entity to offer recreational programs specially designed for children with mobility impairments. However, it would be a violation of this section if the entity then excluded these children from other recreational services for which they are qualified to participate when these services are made available to nondisabled children, or if the entity required children with disabilities to attend only designated programs.

Many commenters asked that the Department clarify a public entity's obligations within the integrated program when it offers a separate program but an individual with a disability chooses not to participate in the separate program. It is impossible to make a blanket statement as to what level of auxiliary aids or modifications would be required in the integrated program. Rather, each situation must be assessed individually. The starting point is to question whether the separate program is in fact necessary or appropriate for the individual. Assuming the separate program would be appropriate for a particular individual, the extent to which that individual must be provided with modifications in the integrated program will depend not only on what the individual needs but also on the limitations and defenses of this part. For example, it may constitute an undue burden for a public accommodation, which provides a full-time interpreter in its special guided tour for individuals with hearing impairments, to hire an additional interpreter for those individuals who choose to attend the integrated program. The Department cannot identify categorically the level of assistance or aid required in the integrated program.

Paragraph (b)(1)(v) provides that a public entity may not aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program. This paragraph is taken from the regulations implementing section 504 for federally assisted programs.

Paragraph (b)(1)(vi) prohibits the public entity from denying a qualified individual with a disability the opportunity to participate as a member of a planning or advisory board.

Paragraph (b)(1)(vii) prohibits the public entity from limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving any aid, benefit, or service.

Paragraph (b)(3) prohibits the public entity from utilizing criteria or methods of administration that deny individuals with disabilities access to the public entity's services, programs, and activities or that perpetuate the discrimination of another public entity, if both public entities are subject to common administrative control or are agencies of the same State. The phrase "criteria or methods of administration" refers to official written policies of the public entity and to the actual practices of the public entity. This paragraph prohibits both blatantly exclusionary policies or practices and nonessential policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate. This standard is consistent with the interpretation of section 504 by the U.S. Supreme Court in *Alexander v. Choate*, 469 U.S. 287 (1985). The Court in Choate explained that members of Congress made numerous statements during passage of section 504 regarding eliminating architectural barriers, providing access to transportation, and eliminating discriminatory effects of job qualification procedures. The Court then noted: "These statements would ring hollow if the resulting legislation could not rectify the harms resulting from action that discriminated by effect as well as by design." *Id.* at 297 (footnote omitted).

Paragraph (b)(4) specifically applies the prohibition enunciated in {35.130(b)(3) to the process of selecting sites for construction of new facilities or selecting existing facilities to be used by the public entity. Paragraph (b)(4) does not apply to construction of additional buildings at an existing site.