Paragraph (b)(5) prohibits the public entity, in the selection of procurement contractors, from using criteria that subject qualified individuals with disabilities to discrimination on the basis of disability.

Paragraph (b)(6) prohibits the public entity from discriminating against qualified individuals with disabilities on the basis of disability in the granting of licenses or certification. A person is a "qualified individual with a disability" with respect to licensing or certification if he or she can meet the essential eligibility requirements for receiving the license or certification (see {35.104).

A number of commenters were troubled by the phrase "essential eligibility requirements" as applied to State licensing requirements, especially those for health care professions. Because of the variety of types of programs to which the definition of "qualified individual with a disability" applies, it is not possible to use more specific language in the definition. The phrase "essential eligibility requirements," however, is taken from the definitions in the regulations implementing section 504, so caselaw under section 504 will be applicable to its interpretation. In *Southeastern Community College v. Davis*, 442 U.S. 397, for example, the Supreme Court held that section 504 does not require an institution to "lower or effect substantial modifications of standards to accommodate a handicapped person," 442 U.S. at 413, and that the school had established that the plaintiff was not "qualified" because she was not able to "serve the nursing profession in all customary ways," *id.* Whether a particular requirement is "essential" will, of course, depend on the facts of the particular case.

In addition, the public entity may not establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. For example, the public entity must comply with this requirement when establishing safety standards for the operations of licensees. In that case the public entity must ensure that standards that it promulgates do not discriminate against the employment of qualified individuals with disabilities in an impermissible manner.

Paragraph (b)(6) does not extend the requirements of the Act or this part directly to the programs or activities of licensees or certified entities themselves. The programs or activities of licensees or certified entities are not themselves programs or activities of the public entity merely by virtue of the license or certificate.

Paragraph (b)(7) is a specific application of the requirement under the general prohibitions of discrimination that public entities make reasonable modifications in policies, practices, or procedures where necessary to avoid discrimination on the basis of disability. Section 302(b)(2)(A)(ii) of the ADA sets out this requirement specifically for public accommodations covered by title III of the Act, and the House Judiciary Committee Report directs the Attorney General to include those specific requirements in the title II regulation to the extent that they do not conflict with the regulations implementing section 504. Judiciary report at 52.

Paragraph (b)(8), a new paragraph not contained in the proposed rule, prohibits the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered. This prohibition is also a specific application of the general prohibitions of discrimination and is based on section 302(b)(2)(A)(i) of the ADA. It prohibits overt denials of equal treatment of individuals with disabilities, or establishment of exclusive or segregative criteria that would bar individuals with disabilities from participation in services, benefits, or activities.

Paragraph (b)(8) also prohibits policies that unnecessarily impose requirements or burdens on

individuals with disabilities that are not placed on others. For example, public entities may not require that a qualified individual with a disability be accompanied by an attendant. A public entity is not, however, required to provide attendant care, or assistance in toileting, eating, or dressing to individuals with disabilities, except in special circumstances, such as where the individual is an inmate of a custodial or correctional institution.

In addition, paragraph (b)(8) prohibits the imposition of criteria that "tend to" screen out an individual with a disability. This concept, which is derived from current regulations under section 504 (*see, e.g.*, 45 CFR 84.13), makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, indirectly prevent or limit their ability to participate. For example, requiring presentation of a driver's license as the sole means of identification for purposes of paying by check would violate this section in situations where, for example, individuals with severe vision impairments or developmental disabilities or epilepsy are ineligible to receive a driver's license and the use of an alternative means of identification, such as another photo I.D. or credit card, is feasible.

A public entity may, however, impose neutral rules and criteria that screen out, or tend to screen out, individuals with disabilities if the criteria are necessary for the safe operation of the program in question. Examples of safety qualifications that would be justifiable in appropriate circumstances would include eligibility requirements for drivers' licenses, or a requirement that all participants in a recreational rafting expedition be able to meet a necessary level of swimming proficiency. Safety requirements must be based on actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities.

Paragraph (c) provides that nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities, beyond those required by this part. It is derived from a provision in the section 504 regulations that permits programs conducted pursuant to Federal statute or Executive order that are designed to benefit only individuals with disabilities or a given class of individuals with disabilities to be limited to those individuals with disabilities. Section 504 ensures that federally assisted programs are made available to all individuals, without regard to disabilities, unless the Federal program under which the assistance is provided is specifically limited to individuals with disabilities or a particular class of individuals with disabilities. Because coverage under this part is not limited to federally assisted programs, paragraph (c) has been revised to clarify that State and local governments may provide special benefits, beyond those required by the nondiscrimination requirements of this part, that are limited to individuals with disabilities or a particular class of individuals with disabilities, without thereby incurring additional obligations to persons without disabilities or to other classes of individuals with disabilities.

Paragraphs (d) and (e), previously referred to in the discussion of paragraph (b)(1)(iv), provide that the public entity must administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities, *i.e.*, in a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible, and that persons with disabilities must be provided the option of declining to accept a particular accommodation.

Some commenters expressed concern that {35.130(e), which states that nothing in the rule requires an individual with a disability to accept special accommodations and services provided under the ADA, could be interpreted to allow guardians of infants or older people with disabilities to refuse medical treatment for their wards. Section 35.130(e) has been revised to make it clear that paragraph (e) is inapplicable to the concern of the commenters. A new paragraph (e)(2) has been added stating that nothing in the regulation authorizes the representative or guardian of an individual with a disability to

decline food, water, medical treatment, or medical services for that individual. New paragraph (e) clarifies that neither the ADA nor the regulation alters current Federal law ensuring the rights of incompetent individuals with disabilities to receive food, water, and medical treatment. *See, e.g.,* Child Abuse Amendments of 1984 (42 U.S.C. 5106a(b)(10), 5106g(10)); Rehabilitation Act of 1973, as amended (29 U.S.C. 794); the Developmentally Disabled Assistance and Bill of Rights Act (42 U.S.C. 6042).

Sections 35.130(e)(1) and (2) are based on section 501(d) of the ADA. Section 501(d) was designed to clarify that nothing in the ADA requires individuals with disabilities to accept special accommodations and services for individuals with disabilities that may segregate them:

The Committee added this section [501(d)] to clarify that nothing in the ADA is intended to permit discriminatory treatment on the basis of disability, even when such treatment is rendered under the guise of providing an accommodation, service, aid or benefit to the individual with disability. For example, a blind individual may choose not to avail himself or herself of the right to go to the front of a line, even if a particular public accommodation has chosen to offer such a modification of a policy for blind individuals. Or, a blind individual may choose to decline to participate in a special museum tour that allows persons to touch sculptures in an exhibit and instead tour the exhibits at his or her own pace with the museum's recorded tour.

Judiciary report at 71-72. The Act is not to be construed to mean that an individual with disabilities must accept special accommodations and services for individuals with disabilities when that individual can participate in the regular services already offered. Because medical treatment, including treatment for particular conditions, is not a special accommodation or service for individuals with disabilities under section 501(d), neither the Act nor this part provides affirmative authority to suspend such treatment. Section 501(d) is intended to clarify that the Act is not designed to foster discrimination through mandatory acceptance of special services when other alternatives are provided; this concern does not reach to the provision of medical treatment for the disabling condition itself.

Paragraph (f) provides that a public entity may not place a surcharge on a particular individual with a disability, or any group of individuals with disabilities, to cover any costs of measures required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part. Such measures may include the provision of auxiliary aids or of modifications required to provide program accessibility.

Several commenters asked for clarification that the costs of interpreter services may not be assessed as an element of "court costs." The Department has already recognized that imposition of the cost of courtroom interpreter services is impermissible under section 504. The preamble to the Department's section 504 regulation for its federally assisted programs states that where a court system has an obligation to provide qualified interpreters, "it has the corresponding responsibility to pay for the services of the interpreters." (45 FR 37630 (June 3, 1980)). Accordingly, recouping the costs of interpreter services by assessing them as part of court costs would also be prohibited.

Paragraph (g), which prohibits discrimination on the basis of an individual's or entity's known relationship or association with an individual with a disability, is based on sections 102(b)(4) and 302(b)(1)(E) of the ADA. This paragraph was not contained in the proposed rule. The individuals covered under this paragraph are any individuals who are discriminated against because of their known association with an individual with a disability. For example, it would be a violation of this paragraph for a local government to refuse to allow a theater company to use a school auditorium on the grounds that the company had recently performed for an audience of individuals with HIV disease.

This protection is not limited to those who have a familial relationship with the individual who has a disability. Congress considered, and rejected, amendments that would have limited the scope of this provision to specific associations and relationships. Therefore, if a public entity refuses admission to a person with cerebral palsy and his or her companions, the companions have an independent right of action under the ADA and this section.

During the legislative process, the term "entity" was added to section 302(b)(l)(E) to clarify that the scope of the provision is intended to encompass not only persons who have a known association with a person with a disability, but also entities that provide services to or are otherwise associated with such individuals. This provision was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association with persons with disabilities.

### {35.131 Illegal use of drugs.

Section 35.131 effectuates section 510 of the ADA, which clarifies the Act's application to people who use drugs illegally. Paragraph (a) provides that this part does not prohibit discrimination based on an individual's current illegal use of drugs.

The Act and the regulation distinguish between illegal use of drugs and the legal use of substances, whether or not those substances are "controlled substances," as defined in the Controlled Substances Act (21 U.S.C. 812). Some controlled substances are prescription drugs that have legitimate medical uses. Section 35.131 does not affect use of controlled substances pursuant to a valid prescription under supervision by a licensed health care professional, or other use that is authorized by the Controlled Substances Act or any other provision of Federal law. It does apply to illegal use of those substances, as well as to illegal use of controlled substances that are not prescription drugs. The key question is whether the individual's use of the substance is illegal, not whether the substance has recognized legal uses. Alcohol is not a controlled substance, so use of alcohol is not addressed by {35.131 (although alcoholics are individuals with disabilities, subject to the protections of the statute).

A distinction is also made between the use of a substance and the status of being addicted to that substance. Addiction is a disability, and addicts are individuals with disabilities protected by the Act. The protection, however, does not extend to actions based on the illegal use of the substance. In other words, an addict cannot use the fact of his or her addiction as a defense to an action based on illegal use of drugs. This distinction is not artificial. Congress intended to deny protection to people who engage in the illegal use of drugs, whether or not they are addicted, but to provide protection to addicts so long as they are not currently using drugs.

A third distinction is the difficult one between current use and former use. The definition of "current illegal use of drugs" in {35.104, which is based on the report of the Conference Committee, H.R. Conf. Rep. No. 596, 101st Cong., 2d Sess. 64 (1990) [hereinafter "Conference report"], is "illegal use of drugs that occurred recently enough to justify a reasonable belief that a person's drug use is current or that continuing use is a real and ongoing problem."

Paragraph (a)(2)(i) specifies that an individual who has successfully completed a supervised drug rehabilitation program or has otherwise been rehabilitated successfully and who is not engaging in current illegal use of drugs is protected. Paragraph (a)(2)(ii) clarifies that an individual who is currently participating in a supervised rehabilitation program and is not engaging in current illegal use of drugs is protected. Paragraph (a)(2)(iii) provides that a person who is erroneously regarded as engaging in current illegal use of drugs, but who is not engaging in such use, is protected.

Paragraph (b) provides a limited exception to the exclusion of current illegal users of drugs from the protections of the Act. It prohibits denial of health services, or services provided in connection with drug rehabilitation to an individual on the basis of current illegal use of drugs, if the individual is otherwise entitled to such services. A health care facility, such as a hospital or clinic, may not refuse treatment to an individual in need of the services it provides on the grounds that the individual is illegally using drugs, but it is not required by this section to provide services that it does not ordinarily provide. For example, a health care facility that specializes in a particular type of treatment, such as care of burn victims, is not required to provide drug rehabilitation services, but it cannot refuse to treat a individual's burns on the grounds that the individual is illegally using drugs.

Some commenters pointed out that abstention from the use of drugs is an essential condition of participation in some drug rehabilitation programs, and may be a necessary requirement in inpatient or residential settings. The Department believes that this comment is well-founded. Congress clearly intended to prohibit exclusion from drug treatment programs of the very individuals who need such programs because of their use of drugs, but, once an individual has been admitted to a program, abstention may be a necessary and appropriate condition to continued participation. The final rule therefore provides that a drug rehabilitation or treatment program may prohibit illegal use of drugs by individuals while they are participating in the program.

Paragraph (c) expresses Congress' intention that the Act be neutral with respect to testing for illegal use of drugs. This paragraph implements the provision in section 510(b) of the Act that allows entities "to adopt or administer reasonable policies or procedures, including but not limited to drug testing," that ensure that an individual who is participating in a supervised rehabilitation program, or who has completed such a program or otherwise been rehabilitated successfully is no longer engaging in the illegal use of drugs. The section is not to be "construed to encourage, prohibit, restrict, or authorize the conducting of testing for the illegal use of drugs."

Paragraph 35.131(c) clarifies that it is not a violation of this part to adopt or administer reasonable policies or procedures to ensure that an individual who formerly engaged in the illegal use of drugs is not currently engaging in illegal use of drugs. Any such policies or procedures must, of course, be reasonable, and must be designed to identify accurately the illegal use of drugs. This paragraph does not authorize inquiries, tests, or other procedures that would disclose use of substances that are not controlled substances or are taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law, because such uses are not included in the definition of "illegal use of drugs." A commenter argued that the rule should permit testing for lawful use of prescription drugs, but most commenters preferred that tests must be limited to *unlawful* use in order to avoid revealing the lawful use of prescription medicine used to treat disabilities.

### {35.132 Smoking.

Section 35.132 restates the clarification in section 501(b) of the Act that the Act does not preclude the prohibition of, or imposition of restrictions on, smoking in transportation covered by title II. Some commenters argued that this section is too limited in scope, and that the regulation should prohibit smoking in all facilities used by public entities. The reference to smoking in section 501, however, merely clarifies that the Act does not require public entities to accommodate smokers by permitting them to smoke in transportation facilities.

### {35.133 Maintenance of accessible features.

Section 35.133 provides that a public entity shall maintain in operable working condition those features

of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part. The Act requires that, to the maximum extent feasible, facilities must be accessible to, and usable by, individuals with disabilities. This section recognizes that it is not sufficient to provide features such as accessible routes, elevators, or ramps, if those features are not maintained in a manner that enables individuals with disabilities to use them. Inoperable elevators, locked accessible doors, or "accessible" routes that are obstructed by furniture, filing cabinets, or potted plants are neither "accessible to" nor "usable by" individuals with disabilities.

Some commenters objected that this section appeared to establish an absolute requirement and suggested that language from the preamble be included in the text of the regulation. It is, of course, impossible to guarantee that mechanical devices will never fail to operate. Paragraph (b) of the final regulation provides that this section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs. This paragraph is intended to clarify that temporary obstructions or isolated instances of mechanical failure would not be considered violations of the Act or this part. However, allowing obstructions or "out of service" equipment to persist beyond a reasonable period of time would violate this part, as would repeated mechanical failures due to improper or inadequate maintenance. Failure of the public entity to ensure that accessible routes are properly maintained and free of obstructions, or failure to arrange prompt repair of inoperable elevators or other equipment intended to provide access would also violate this part.

Other commenters requested that this section be expanded to include specific requirements for inspection and maintenance of equipment, for training staff in the proper operation of equipment, and for maintenance of specific items. The Department believes that this section properly establishes the general requirement for maintaining access and that further details are not necessary.

### {35.134 Retaliation or coercion.

Section 35.134 implements section 503 of the ADA, which prohibits retaliation against any individual who exercises his or her rights under the Act. This section is unchanged from the proposed rule. Paragraph (a) of {35.134 provides that no private or public entity shall discriminate against any individual because that individual has exercised his or her right to oppose any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part.

Paragraph (b) provides that no private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise of his or her rights under this part or because that individual aided or encouraged any other individual in the exercise or enjoyment of any right granted or protected by the Act or this part.

This section protects not only individuals who allege a violation of the Act or this part, but also any individuals who support or assist them. This section applies to all investigations or proceedings initiated under the Act or this part without regard to the ultimate resolution of the underlying allegations. Because this section prohibits any act of retaliation or coercion in response to an individual's effort to exercise rights established by the Act and this part (or to support the efforts of another individual), the section applies not only to public entities subject to this part, but also to persons acting in an individual capacity or to private entities. For example, it would be a violation of the Act and this part for a private individual to harass or intimidate an individual with a disability in an effort to prevent that individual from attending a concert in a State-owned park. It would, likewise, be a violation of the Act and this part for a private entity to take adverse action against an employee who appeared as a witness on behalf of an individual who sought to enforce the Act.

### {35.135 Personal devices and services.

The final rule includes a new {35.135, entitles "Personal devices and services," which states that the provision of personal devices and services is not required by title II. This new section, which serves as a limitation on all of the requirements of the regulation, replaces {35.160(b)(2) of the proposed rule, which addressed the issue of personal devices and services explicitly only in the context of communications. The personal devices and services limitation was intended to have general application in the proposed rule in all contexts where it was relevant. The final rule, therefore, clarifies this point by including a general provision that will explicitly apply not only to auxiliary aids and services but across-the-board to include other relevant areas such as, for example, modifications in policies, practices, and procedures ({35.130(b)(7)). The language of {35.135 parallels an analogous provision in the Department's title III regulations (28 CFR {36.306) but preserves the explicit reference to "readers for personal use or study" in {35.160(b)(2) of the proposed rule. This section does not preclude the short-term loan of personal receivers that are part of an assistive listening system.

### Subpart C — Employment

### {35.140 Employment discrimination prohibited.

Title II of the ADA applies to all activities of public entities, including their employment practices. The proposed rule cross-referenced the definitions, requirements, and procedures of title I of the ADA, as established by the Equal Employment Opportunity Commission in 29 CFR Part 1630. This proposal would have resulted in use, under {35.140, of the title I definition of "employer," so that a public entity with 25 or more employees would have become subject to the requirements of {35.140 on July 26, 1992, one with 15 to 24 employees on July 26, 1994, and one with fewer than 15 employees would have been excluded completely.

The Department received comments objecting to this approach. The commenters asserted that Congress intended to establish nondiscrimination requirements for employment by all public entities, including those that employ fewer than 15 employees; and that Congress intended the employment requirements of title II to become effective at the same time that the other requirements of this regulation become effective, January 26, 1992. The Department has reexamined the statutory language and legislative history of the ADA on this issue and has concluded that Congress intended to cover the employment practices of all public entities and that the applicable effective date is that of title II.

The statutory language of section 204(b) of the ADA requires the Department to issue a regulation that is consistent with the ADA and the Department's coordination regulation under section 504, 28 CFR part 41. The coordination regulation specifically requires nondiscrimination in employment, 28 CFR {{41.52-41.55, and does not limit coverage based on size of employer. Moreover, under all section 504 implementing regulations issued in accordance with the Department's coordination regulation, employment coverage under section 504 extends to all employers with federally assisted programs or activities, regardless of size, and the effective date for those employment requirements has always been the same as the effective date for nonemployment requirements established in the same regulations. The Department therefore concludes that {35.140 must apply to all public entities upon the effective date of this regulation.

In the proposed regulation the Department cross-referenced the regulations implementing title I of the ADA, issued by the Equal Employment Opportunity Commission at 29 CFR part 1630, as a compliance standard for {35.140 because, as proposed, the scope of coverage and effective date of coverage under title II would have been coextensive with title I. In the final regulation this language is modified slightly.

Subparagraph (1) of new paragraph (b) makes it clear that the standards established by the Equal Employment Opportunity Commission in 29 CFR part 1630 will be the applicable compliance standards if the public entity is subject to title I. If the public entity is not covered by title I, or until it is covered by title I, subparagraph (b)(2) cross- references section 504 standards for what constitutes employment discrimination, as established by the Department of Justice in 28 CFR part 41. Standards for title I of the ADA and section 504 of the Rehabilitation Act are for the most part identical because title I of the ADA was based on requirements set forth in regulations implementing section 504.

The Department, together with the other Federal agencies responsible for the enforcement of Federal laws prohibiting employment discrimination on the basis of disability, recognizes the potential for jurisdictional overlap that exists with respect to coverage of public entities and the need to avoid problems related to overlapping coverage. The other Federal agencies include the Equal Employment Opportunity Commission, which is the agency primarily responsible for enforcement of title I of the ADA, the Department of Labor, which is the agency responsible for enforcement of section 503 of the Rehabilitation Act of 1973, and 26 Federal agencies with programs of Federal financial assistance, which are responsible for enforcing section 504 in those programs. Section 107 of the ADA requires that coordination mechanisms be developed in connection with the administrative enforcement of complaints alleging discrimination under title I and complaints alleging discrimination in employment in violation of the Rehabilitation Act. Although the ADA does not specifically require inclusion of employment complaints under title II in the coordinating mechanisms required by title I, Federal investigations of title II employment complaints will be coordinated on a government-wide basis also. The Department is currently working with the EEOC and other affected Federal agencies to develop effective coordinating mechanisms, and final regulations on this issue will be issued on or before January 26, 1992.

## Subpart D — Program Accessibility

### {35.149 Discrimination prohibited.

Section 35.149 states the general nondiscrimination principle underlying the program accessibility requirements of {{35.150 and 35.151.

### {35.150 Existing facilities.

Consistent with section 204(b) of the Act, this regulation adopts the program accessibility concept found in the section 504 regulations for federally conducted programs or activities (e.g., 28 CFR Part 39). The concept of "program accessibility" was first used in the section 504 regulation adopted by the Department of Health, Education, and Welfare for its federally assisted programs and activities in 1977. It allowed recipients to make their federally assisted programs and activities available to individuals with disabilities without extensive retrofitting of their existing buildings and facilities, by offering those programs through alternative methods. Program accessibility has proven to be a useful approach and was adopted in the regulations issued for programs and activities conducted by Federal Executive agencies. The Act provides that the concept of program access will continue to apply with respect to facilities now in existence, because the cost of retrofitting existing facilities is often prohibitive.

Section 35.150 requires that each service, program, or activity conducted by a public entity, when viewed in its entirety, be readily accessible to and usable by individuals with disabilities. The regulation makes clear, however, that a public entity is not required to make each of its existing facilities accessible ({35.150(a)(1)). Unlike title III of the Act, which requires public accommodations to remove architectural barriers where such removal is "readily achievable," or to provide goods and services through alternative methods, where those methods are "readily achievable," title II requires a public

entity to make its programs accessible in all cases, except where to do so would result in a fundamental alteration in the nature of the program or in undue financial and administrative burdens. Congress intended the "undue burden" standard in title II to be significantly higher than the "readily achievable" standard in title III. Thus, although title II may not require removal of barriers in some cases where removal would be required under title III, the program access requirement of title II should enable individuals with disabilities to participate in and benefit from the services, programs, or activities of public entities in all but the most unusual cases.

Paragraph (a)(2), which establishes a special limitation on the obligation to ensure program accessibility in historic preservation programs, is discussed below in connection with paragraph (b).

Paragraph (a)(3), which is taken from the section 504 regulations for federally conducted programs, generally codifies case law that defines the scope of the public entity's obligation to ensure program accessibility. This paragraph provides that, in meeting the program accessibility requirement, a public entity is not required to take any action that would result in a fundamental alteration in the nature of its service, program, or activity or in undue financial and administrative burdens. A similar limitation is provided in {35.164.

This paragraph does not establish an absolute defense; it does not relieve a public entity of all obligations to individuals with disabilities. Although a public entity is not required to take actions that would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens, it nevertheless must take any other steps necessary to ensure that individuals with disabilities receive the benefits or services provided by the public entity.

It is the Department's view that compliance with {35.150(a), like compliance with the corresponding provisions of the section 504 regulations for federally conducted programs, would in most cases not result in undue financial and administrative burdens on a public entity. In determining whether financial and administrative burdens are undue, all public entity resources available for use in the funding and operation of the service, program, or activity should be considered. The burden of proving that compliance with paragraph (a) of {35.150 would fundamentally alter the nature of a service, program, or activity or would result in undue financial and administrative burdens rests with the public entity.

The decision that compliance would result in such alteration or burdens must be made by the head of the public entity or his or her designee and must be accompanied by a written statement of the reasons for reaching that conclusion. The Department recognizes the difficulty of identifying the official responsible for this determination, given the variety of organizational forms that may be taken by public entities and their components. The intention of this paragraph is that the determination must be made by a high level official, no lower than a Department head, having budgetary authority and responsibility for making spending decisions.

Any person who believes that he or she or any specific class of persons has been injured by the public entity head's decision or failure to make a decision may file a complaint under the compliance procedures established in subpart F.

Paragraph (b)(1) sets forth a number of means by which program accessibility may be achieved, including redesign of equipment, reassignment of services to accessible buildings, and provision of aides.

The Department wishes to clarify that, consistent with longstanding interpretation of section 504, carrying an individual with a disability is considered an ineffective and therefore an unacceptable

method for achieving program accessibility. Department of Health, Education, and Welfare, Office of Civil Rights, Policy Interpretation No. 4, 43 Fed. Reg. 36035 (August 14, 1978). Carrying will be permitted only in manifestly exceptional cases, and only if all personnel who are permitted to participate in carrying an individual with a disability are formally instructed on the safest and least humiliating means of carrying. "Manifestly exceptional" cases in which carrying would be permitted might include, for example, programs conducted in unique facilities, such as an oceanographic vessel, for which structural changes and devices necessary to adapt the facility for use by individuals with mobility impairments are unavailable or prohibitively expensive. Carrying is not permitted as an alternative to structural modifications such as installation of a ramp or a chairlift.

In choosing among methods, the public entity shall give priority consideration to those that will be consistent with provision of services in the most integrated setting appropriate to the needs of individuals with disabilities. Structural changes in existing facilities are required only when there is no other feasible way to make the public entity's program accessible. (It should be noted that "structural changes" include all physical changes to a facility; the term does not refer only to changes to structural features, such as removal of or alteration to a load-bearing structural member.) The requirements of {35.151 for alterations apply to structural changes undertaken to comply with this section. The public entity may comply with the program accessibility requirement by delivering services at alternate accessible sites or making home visits as appropriate.

*Historic preservation programs.* In order to avoid possible conflict between the congressional mandates to preserve historic properties, on the one hand, and to eliminate discrimination against individuals with disabilities on the other, paragraph (a)(2) provides that a public entity is not required to take any action that would threaten or destroy the historic significance of an historic property. The special limitation on program accessibility set forth in paragraph (a)(2) is applicable only to historic preservation programs, as defined in {35.104, that is, programs that have preservation of historic properties as a primary purpose. Narrow application of the special limitation is justified because of the inherent flexibility of the program accessibility requirement. Where historic preservation is not a primary purpose of the program, the public entity is not required to use a particular facility. It can relocate all or part of its program to an accessible facility, make home visits, or use other standard methods of achieving program accessibility without making structural alterations that might threaten or destroy significant historic features of the historic property. Thus, government programs located in historic properties, such as an historic State capitol, are not excused from the requirement for program access.

Paragraph (a)(2), therefore, will apply only to those programs that uniquely concern the preservation and experience of the historic property itself. Because the primary benefit of an historic preservation program is the experience of the historic property, paragraph (b)(2) requires the public entity to give priority to methods of providing program accessibility that permit individuals with disabilities to have physical access to the historic property. This priority on physical access may also be viewed as a specific application of the general requirement that the public entity administer programs in the most integrated setting appropriate to the needs of qualified individuals with disabilities ({35.130(d)). Only when providing physical access would threaten or destroy the historic significance of an historic property, or would result in a fundamental alteration in the nature of the program or in undue financial and administrative burdens, may the public entity adopt alternative methods for providing program accessibility that do not ensure physical access. Examples of some alternative methods are provided in paragraph (b)(2).

*Time periods.* Paragraphs (c) and (d) establish time periods for complying with the program accessibility requirement. Like the regulations for federally assisted programs (e.g., 28 CFR 41.57(b)), paragraph (c) requires the public entity to make any necessary structural changes in facilities as soon as practicable, but in no event later than three years after the effective date of this regulation.

The proposed rule provided that, aside from structural changes, all other necessary steps to achieve compliance with this part must be taken within sixty days. The sixty day period was taken from regulations implementing section 504, which generally were effective no more than thirty days after publication. Because this regulation will not be effective until January 26, 1992, the Department has concluded that no additional transition period for non-structural changes is necessary, so the sixty day period has been omitted in the final rule. Of course, this section does not reduce or eliminate any obligations that are already applicable to a public entity under section 504.

Where structural modifications are required, paragraph (d) requires that a transition plan be developed by an entity that employs 50 or more persons, within six months of the effective date of this regulation. The legislative history of title II of the ADA makes it clear that, under title II, "local and state governments are required to provide curb cuts on public streets." Education and Labor report at 84. As the rationale for the provision of curb cuts, the House report explains, "The employment, transportation, and public accommodation sections of . . . [the ADA] would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets." *Id.* Section 35.151 (e), which establishes accessibility requirements for new construction and alterations, requires that all newly constructed or altered streets, roads, or highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway, and all newly constructed or altered street level pedestrian walkways must have curb ramps or other sloped areas at intersections to streets, roads, or highways. A new paragraph (d)(2) has been added to the final rule to clarify the application of the general requirement for program accessibility to the provision of curb cuts at existing crosswalks. This paragraph requires that the transition plan include a schedule for providing curb ramps or other sloped areas at existing pedestrian walkways, giving priority to walkways serving entities covered by the Act, including State and local government offices and facilities, transportation, public accommodations, and employers, followed by walkways serving other areas. Pedestrian "walkways" include locations where access is required for use of public transportation, such as bus stops that are not located at intersections or crosswalks.

Similarly, a public entity should provide an adequate number of accessible parking spaces in existing parking lots or garages over which it has jurisdiction.

Paragraph (d)(3) provides that, if a public entity has already completed a transition plan required by a regulation implementing section 504, the transition plan required by this part will apply only to those policies and practices that were not covered by the previous transition plan. Some commenters suggested that the transition plan should include all aspects of the public entity's operations, including those that may have been covered by a previous transition plan under section 504. The Department believes that such a duplicative requirement would be inappropriate. Many public entities may find, however, that it will be simpler to include all of their operations in the transition plan than to attempt to identify and exclude specifically those that were addressed in a previous plan. Of course, entities covered under section 504 are not shielded from their obligations under that statute merely because they are included under the transition plan developed under this section.

**{35.151 New construction and alterations.**

Section 35.151 provides that those buildings that are constructed or altered by, on behalf of, or for the use of a public entity shall be designed, constructed, or altered to be readily accessible to and usable by individuals with disabilities if the construction was commenced after the effective date of this part. Facilities under design on that date will be governed by this section if the date that bids were invited falls after the effective date. This interpretation is consistent with Federal practice under section 504.

Section 35.151(c) establishes two standards for accessible new construction and alteration. Under paragraph (c), design, construction, or alteration of facilities in conformance with the Uniform Federal Accessibility Standards (UFAS) or with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (hereinafter ADAAG) shall be deemed to comply with the requirements of this section with respect to those facilities except that, if ADAAG is chosen, the elevator exemption contained at {{36.401(d) and 36.404 does not apply. ADAAG is the standard for private buildings and was issued as guidelines by the Architectural and Transportation Barriers Compliance Board (ATBCB) under title III of the ADA. It has been adopted by the Department of Justice and is published as Appendix A to the Department's title III rule in today's *Federal Register*. Departures from particular requirements of these standards by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided. Use of two standards is a departure from the proposed rule.

The proposed rule adopted UFAS as the only interim accessibility standard because that standard was referenced by the regulations implementing section 504 of the Rehabilitation Act promulgated by most Federal funding agencies. It is, therefore, familiar to many State and local government entities subject to this rule. The Department, however, received many comments objecting to the adoption of UFAS. Commenters pointed out that, except for the elevator exemption, UFAS is not as stringent as ADAAG. Others suggested that the standard should be the same to lessen confusion.

Section 204(b) of the Act states that title II regulations must be consistent not only with section 504 regulations but also with "this Act." Based on this provision, the Department has determined that a public entity should be entitled to choose to comply either with ADAAG or UFAS.

Public entities who choose to follow ADAAG, however, are not entitled to the elevator exemption contained in title III of the Act and implemented in the title III regulation at {36.401(d) for new construction and {36.404 for alterations. Section 303(b) of title III states that, with some exceptions, elevators are not required in facilities that are less than three stories or have less than 3000 square feet per story. The section 504 standard, UFAS, contains no such exemption. Section 501 of the ADA makes clear that nothing in the Act may be construed to apply a lesser standard to public entities than the standards applied under section 504. Because permitting the elevator exemption would clearly result in application of a lesser standard than that applied under section 504, paragraph (c) states that the elevator exemption does not apply when public entities choose to follow ADAAG. Thus, a two-story courthouse, whether built according to UFAS or ADAAG, must be constructed with an elevator. It should be noted that Congress did not include an elevator exemption for public transit facilities covered by subtitle B of title II, which covers public transportation provided by public entities, providing further evidence that Congress intended that public buildings have elevators.

Section 504 of the ADA requires the ATBCB to issue supplemental Minimum Guidelines and Requirements for Accessible Design of buildings and facilities subject to the Act, including title II. Section 204(c) of the ADA provides that the Attorney General shall promulgate regulations implementing title II that are consistent with the ATBCB's ADA guidelines. The ATBCB has announced its intention to issue title II guidelines in the future. The Department anticipates that, after the ATBCB's title II guidelines have been published, this rule will be amended to adopt new accessibility standards consistent with the ATBCB's rulemaking. Until that time, however, public entities will have a choice of following UFAS or ADAAG, without the elevator exemption.

Existing buildings leased by the public entity after the effective date of this part are not required by the regulation to meet accessibility standards simply by virtue of being leased. They are subject, however, to the program accessibility standard for existing facilities in {35.150. To the extent the buildings are

newly constructed or altered, they must also meet the new construction and alteration requirements of {35.151.

The Department received many comments urging that the Department require that public entities lease only accessible buildings. Federal practice under section 504 has always treated newly leased buildings as subject to the existing facility program accessibility standard. Section 204(b) of the Act states that, in the area of "program accessibility, existing facilities," the title II regulations must be consistent with section 504 regulations. Thus, the Department has adopted the section 504 principles for these types of leased buildings. Unlike the construction of new buildings where architectural barriers can be avoided at little or no cost, the application of new construction standards to an existing building being leased raises the same prospect of retrofitting buildings as the use of an existing Federal facility, and the same program accessibility standard should apply to both owned and leased existing buildings. Similarly, requiring that public entities only lease accessible space would significantly restrict the options of State and local governments in seeking leased space, which would be particularly burdensome in rural or sparsely populated areas.

On the other hand, the more accessible the leased space is, the fewer structural modifications will be required in the future for particular employees whose disabilities may necessitate barrier removal as a reasonable accommodation. Pursuant to the requirements for leased buildings contained in the Minimum Guidelines and Requirements for Accessible Design published under the Architectural Barriers Act by the ATBCB, 36 CFR 1190.34, the Federal Government may not lease a building unless it contains (1) one accessible route from an accessible entrance to those areas in which the principal activities for which the building is leased are conducted, (2) accessible toilet facilities, and (3) accessible parking facilities, if a parking area is included within the lease (36 CFR 1190.34). Although these requirements are not applicable to buildings leased by public entities covered by this regulation, such entities are encouraged to look for the most accessible space available to lease and to attempt to find space complying at least with these minimum Federal requirements.

Section 35.151(d) gives effect to the intent of Congress, expressed in section 504(c) of the Act, that this part recognize the national interest in preserving significant historic structures. Commenters criticized the Department's use of descriptive terms in the proposed rule that are different from those used in the ADA to describe eligible historic properties. In addition, some commenters criticized the Department's decision to use the concept of "substantially impairing" the historic features of a property, which is a concept employed in regulations implementing section 504 of the Rehabilitation Act of 1973. Those commenters recommended that the Department adopt the criteria of "adverse effect" published by the Advisory Council on Historic Preservation under the National Historic Preservation Act, 36 CFR 800.9, as the standard for determining whether an historic property may be altered.

The Department agrees with these comments to the extent that they suggest that the language of the rule should conform to the language employed by Congress in the ADA. A definition of "historic property," drawn from section 504 of the ADA, has been added to {35.104 to clarify that the term applies to those properties listed or eligible for listing in the National Register of Historic Places, or properties designated as historic under State or local law.

The Department intends that the exception created by this section be applied only in those very rare situations in which it is not possible to provide access to an historic property using the special access provisions established by UFAS and ADAAG. Therefore, paragraph (d)(1) of {35.151 has been revised to clearly state that alterations to historic properties shall comply, to the maximum extent feasible, with section 4.1.7 of UFAS or section 4.1.7 of ADAAG. Paragraph (d)(2) has been revised to provide that, if it has been determined under the procedures established in UFAS and ADAAG that it is not feasible to

provide physical access to an historic property in a manner that will not threaten or destroy the historic significance of the property, alternative methods of access shall be provided pursuant to the requirements of {35.150.

In response to comments, the Department has added to the final rule a new paragraph (e) setting out the requirements of {36.151 as applied to curb ramps. Paragraph (e) is taken from the statement contained in the preamble to the proposed rule that all newly constructed or altered streets, roads, and highways must contain curb ramps at any intersection having curbs or other barriers to entry from a street level pedestrian walkway, and that all newly constructed or altered street level pedestrian walkways must have curb ramps at intersections to streets, roads, or highways.

## Subpart E — Communications

### {35.160 General.

Section 35.160 requires the public entity to take such steps as may be necessary to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

Paragraph (b)(1) requires the public entity to furnish appropriate auxiliary aids and services when necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, the public entity's service, program, or activity. The public entity must provide an opportunity for individuals with disabilities to request the auxiliary aids and services of their choice. This expressed choice shall be given primary consideration by the public entity (Sec.35.160(b)(2)). The public entity shall honor the choice unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under Sec.35.164.

Deference to the request of the individual with a disability is desirable because of the range of disabilities, the variety of auxiliary aids and services, and different circumstances requiring effective communication. For instance, some courtrooms are now equipped for ``computer-assisted transcripts,'' which allow virtually instantaneous transcripts of courtroom argument and testimony to appear on displays. Such a system might be an effective auxiliary aid or service for a person who is deaf or has a hearing loss who uses speech to communicate, but may be useless for someone who uses sign language.

Although in some circumstances a notepad and written materials may be sufficient to permit effective communication, in other circumstances they may not be sufficient. For example, a qualified interpreter may be necessary when the information being communicated is complex, or is exchanged for a lengthy period of time. Generally, factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication.

Several commenters asked that the rule clarify that the provision of readers is sometimes necessary to ensure access to a public entity's services, programs or activities. Reading devices or readers should be provided when necessary for equal participation and opportunity to benefit from any governmental service, program, or activity, such as reviewing public documents, examining demonstrative evidence, and filling out voter registration forms or forms needed to receive public benefits. The importance of providing qualified readers for examinations administered by public entities is discussed under Sec.35.130. Reading devices and readers are appropriate auxiliary aids and services where necessary to permit an individual with a disability to participate in or benefit from a service, program, or activity.

Section 35.160(b)(2) of the proposed rule, which provided that a public entity need not furnish individually prescribed devices, readers for personal use or study, or other devices of a personal nature, has been deleted in favor of a new section in the final rule on personal devices and services (see Sec.35.135).

In response to comments, the term ``auxiliary aids and services'' is used in place of ``auxiliary aids'' in the final rule. This phrase better reflects the range of aids and services that may be required under this section.

A number of comments raised questions about the extent of a public entity's obligation to provide access to television programming for persons with hearing impairments. Television and videotape programming produced by public entities are covered by this section. Access to audio portions of such programming may be provided by closed captioning.

### {35.161 Telecommunication Devices for the Deaf (TDD's)

Section 35.161 requires that, where a public entity communicates with applicants and beneficiaries by telephone, TDD's or equally effective telecommunication systems be used to communicate with individuals with impaired speech or hearing.

Problems arise when a public entity which does not have a TDD needs to communicate with an individual who uses a TDD or vice versa. Title IV of the ADA addresses this problem by requiring establishment of telephone relay services to permit communications between individuals who communicate by TDD and individuals who communicate by the telephone alone. The relay services required by title IV would involve a relay operator using both a standard telephone and a TDD to type the voice messages to the TDD user and read the TDD messages to the standard telephone user.

Section 204(b) of the ADA requires that the regulation implementing title II with respect to communications be consistent with the Department's regulation implementing section 504 for its federally conducted programs and activities at 28 CFR part 39. Section 35.161, which is taken from Sec.39.160(a)(2) of that regulation, requires the use of TDD's or equally effective telecommunication systems for communication with people who use TDD's. Of course, where relay services, such as those required by title IV of the ADA are available, a public entity may use those services to meet the requirements of this section.

Many commenters were concerned that public entities should not rely heavily on the establishment of relay services. The commenters explained that while relay services would be of vast benefit to both public entities and individuals who use TDD's, the services are not sufficient to provide access to all telephone services. First, relay systems do not provide effective access to the increasingly popular automated systems that require the caller to respond by pushing a button on a touch tone phone. Second, relay systems cannot operate fast enough to convey messages on answering machines, or to permit a TDD user to leave a recorded message. Third, communication through relay systems may not be appropriate in cases of crisis lines pertaining to rape, domestic violence, child abuse, and drugs. The Department believes that it is more appropriate for the Federal Communications Commission to address these issues in its rulemaking under title IV.

Some commenters requested that those entities with frequent contacts with clients who use TDD's have on-site TDD's to provide for direct communication between the entity and the individual. The Department encourages those entities that have extensive telephone contact with the public such as city halls, public libraries, and public aid offices, to have TDD's to insure more immediate access. Where the

provision of telephone service is a major function of the entity, TDD's should be available.

## {35.162 Telephone Emergency Services

Many public entities provide telephone emergency services by which individuals can seek immediate assistance from police, fire, ambulance, and other emergency services. These telephone emergency services -- including ``911'' services -- are clearly an important public service whose reliability can be a matter of life or death. The legislative history of title II specifically reflects congressional intent that public entities must ensure that telephone emergency services, including 911 services, be accessible to persons with impaired hearing and speech through telecommunication technology (Conference report at 67; Education and Labor report at 84 - 85).

Proposed Sec.35.162 mandated that public entities provide emergency telephone services to persons with disabilities that are ``functionally equivalent'' to voice services provided to others. Many commenters urged the Department to revise the section to make clear that direct access to telephone emergency services is required by title II of the ADA as indicated by the legislative history (Conference report at 67 - 68; Education and Labor report at 85). In response, the final rule mandates ``direct access,'' instead of ``access that is functionally equivalent'' to that provided to all other telephone users. Telephone emergency access through a third party or through a relay service would not satisfy the requirement for direct access.

Several commenters asked about a separate seven-digit emergency call number for the 911 services. The requirement for direct access disallows the use of a separate seven-digit number where 911 service is available. Separate seven-digit emergency call numbers would be unfamiliar to many individuals and also more burdensome to use. A standard emergency 911 number is easier to remember and would save valuable time spent in searching in telephone books for a local seven-digit emergency number.

Many commenters requested the establishment of minimum standards of service (e.g., the quantity and location of TDD's and computer modems needed in a given emergency center). Instead of establishing these scoping requirements, the Department has established a performance standard through the mandate for direct access.

Section 35.162 requires public entities to take appropriate steps, including equipping their emergency systems with modern technology, as may be necessary to promptly receive and respond to a call from users of TDD's and computer modems. Entities are allowed the flexibility to determine what is the appropriate technology for their particular needs. In order to avoid mandating use of particular technologies that may become outdated, the Department has eliminated the references to the Baudot and ASCII formats in the proposed rule.

Some commenters requested that the section require the installation of a voice amplification device on the handset of the dispatcher's telephone to amplify the dispatcher's voice. In an emergency, a person who has a hearing loss may be using a telephone that does not have an amplification device. Installation of speech amplification devices on the handsets of the dispatchers' telephones would respond to that situation. The Department encourages their use.

Several commenters emphasized the need for proper maintenance of TDD's used in telephone emergency services. Section 35.133, which mandates maintenance of accessible features, requires public entities to maintain in operable working condition TDD's and other devices that provide direct access to the emergency system.

## {35.163 Information and Signage

Section 35.163(a) requires the public entity to provide information to individuals with disabilities concerning accessible services, activities, and facilities. Paragraph (b) requires the public entity to provide signage at all inaccessible entrances to each of its facilities that directs users to an accessible entrance or to a location with information about accessible facilities.

Several commenters requested that, where TDD-equipped pay phones or portable TDD's exist, clear signage should be posted indicating the location of the TDD. The Department believes that this is required by paragraph (a). In addition, the Department recommends that, in large buildings that house TDD's, directional signage indicating the location of available TDD's should be placed adjacent to banks of telephones that do not contain a TDD.

## {35.164 Duties

Section 35.164, like paragraph (a)(3) of Sec.35.150, is taken from the section 504 regulations for federally conducted programs. Like paragraph (a)(3), it limits the obligation of the public entity to ensure effective communication in accordance with Davis and the circuit court opinions interpreting it. It also includes specific requirements for determining the existence of undue financial and administrative burdens. The preamble discussion of Sec.35.150(a) regarding that determination is applicable to this section and further explains the public entity's obligation to comply with Sec.35.160 - 35.164. Because of the essential nature of the services provided by telephone emergency systems, the Department assumes that Sec.35.164 will rarely be applied to Sec.35.162.

## Subpart F -- Compliance Procedures

Subpart F sets out the procedures for administrative enforcement of this part. Section 203 of the Act provides that the remedies, procedures, and rights set forth in section 505 of the Rehabilitation Act of 1973 (29 U.S.C. 794a) for enforcement of section 504 of the Rehabilitation Act, which prohibits discrimination on the basis of handicap in programs and activities that receive Federal financial assistance, shall be the remedies, procedures, and rights for enforcement of title II. Section 505, in turn, incorporates by reference the remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d to 2000d - 4a). Title VI, which prohibits discrimination on the basis of race, color, or national origin in federally assisted programs, is enforced by the Federal agencies that provide the Federal financial assistance to the covered programs and activities in question. If voluntary compliance cannot be achieved, Federal agencies enforce title VI either by the termination of Federal funds to a program that is found to discriminate, following an administrative hearing, or by a referral to this Department for judicial enforcement.

Title II of the ADA extended the requirements of section 504 to all services, programs, and activities of State and local governments, not only those that receive Federal financial assistance. The House Committee on Education and Labor explained the enforcement provisions as follows:

It is the Committee's intent that administrative enforcement of section 202 of the legislation should closely parallel the Federal government's experience with section 504 of the Rehabilitation Act of 1973. The Attorney General should use section 504 enforcement procedures and the Department's coordination role under Executive Order 12250 as models for regulation in this area.

The Committee envisions that the Department of Justice will identify appropriate Federal agencies to oversee compliance activities for State and local governments. As with section 504, these Federal

agencies, including the Department of Justice, will receive, investigate, and where possible, resolve complaints of discrimination. If a Federal agency is unable to resolve a complaint by voluntary means, . . . the major enforcement sanction for the Federal government will be referral of cases by these Federal agencies to the Department of Justice.

The Department of Justice may then proceed to file suits in Federal district court. As with section 504, there is also a private right of action for persons with disabilities, which includes the full panoply of remedies. Again, consistent with section 504, it is not the Committee's intent that persons with disabilities need to exhaust Federal administrative remedies before exercising their private right of action.

Education & Labor report at 98. *See also* S. Rep. No. 116, 101st Cong., 1st Sess., at 57-58 (1989).

Subpart F effectuates the congressional intent by deferring to section 504 procedures where those procedures are applicable, that is, where a Federal agency has jurisdiction under section 504 by virtue of its provision of Federal financial assistance to the program or activity in which the discrimination is alleged to have occurred. Deferral to the 504 procedures also makes the sanction of fund termination available where necessary to achieve compliance. Because the Civil Rights Restoration Act (Pub. L. 100-259) extended the application of section 504 to all of the operations of the public entity receiving the Federal financial assistance, many activities of State and local governments are already covered by section 504. The procedures in subpart F apply to complaints concerning services, programs, and activities of public entities that are covered by the ADA.

Subpart G designates the Federal agencies responsible for enforcing the ADA with respect to specific components of State and local government. It does not, however, displace existing jurisdiction under section 504 of the various funding agencies. Individuals may still file discrimination complaints against recipients of Federal financial assistance with the agencies that provide that assistance, and the funding agencies will continue to process those complaints under their existing procedures for enforcing section 504. The substantive standards adopted in this part for title II of the ADA are generally the same as those required under section 504 for federally assisted programs, and public entities covered by the ADA are also covered by the requirements of section 504 to the extent that they receive Federal financial assistance. To the extent that title II provides greater protection to the rights of individuals with disabilities, however, the funding agencies will also apply the substantive requirements established under title II and this part in processing complaints covered by both this part and section 504, except that fund termination procedures may be used only for violations of section 504.

Subpart F establishes the procedures to be followed by the agencies designated in subpart G for processing complaints against State and local government entities when the designated agency does not have jurisdiction under section 504.

## {35.170 Complaints.

Section 35.170 provides that any individual who believes that he or she or a specific class of individuals has been subjected to discrimination on the basis of disability by a public entity may, by himself or herself or by an authorized representative, file a complaint under this part within 180 days of the date of the alleged discrimination, unless the time for filing is extended by the agency for good cause. Although {35.107 requires public entities that employ 50 or more persons to establish grievance procedures for resolution of complaints, exhaustion of those procedures is not a prerequisite to filing a complaint under this section. If a complainant chooses to follow the public entity's grievance procedures, however, any resulting delay may be considered good cause for extending the time allowed for filing a complaint

under this part.

Filing the complaint with any Federal agency will satisfy the requirement for timely filing. As explained
below, a complaint filed with an agency that has jurisdiction under section 504 will be processed under
the agency's procedures for enforcing section 504.

Some commenters objected to the complexity of allowing complaints to be filed with different agencies.
The multiplicity of enforcement jurisdiction is the result of following the statutorily mandated
enforcement scheme. The Department has, however, attempted to simplify procedures for complainants
by making the Federal agency that receives the complaint responsible for referring it to an appropriate
agency.

The Department has also added a new paragraph (c) to this section providing that a complaint may be
filed with any agency designated under subpart G of this part, or with any agency that provides funding
to the public entity that is the subject of the complaint, or with the Department of Justice. Under {35.171
(a)(2), the Department of Justice will refer complaints for which it does not have jurisdiction under
section 504 to an agency that does have jurisdiction under section 504, or to the agency designated under
subpart G as responsible for complaints filed against the public entity that is the subject of the complaint
or in the case of an employment complaint that is also subject to title I of the Act, to the Equal
Employment Opportunity Commission. Complaints filed with the Department of Justice may be sent to
the Coordination and Review Section, P.O. Box 66118, Civil Rights Division, U.S. Department of
Justice, Washington, D.C. 20035-6118.

## {35.171 Acceptance of complaints.

Section 35.171 establishes procedures for determining jurisdiction and responsibility for processing
complaints against public entities. The final rule provides complainants an opportunity to file with the
Federal funding agency of their choice. If that agency does not have jurisdiction under section 504,
however, and is not the agency designated under subpart G as responsible for that public entity, the
agency must refer the complaint to the Department of Justice, which will be responsible for referring it
either to an agency that does have jurisdiction under section 504 or to the appropriate designated agency,
or in the case of an employment complaint that is also subject to title I of the Act, to the Equal
Employment Opportunity Commission.

Whenever an agency receives a complaint over which it has jurisdiction under section 504, it will
process the complaint under its section 504 procedures. When the agency designated under subpart G
receives a complaint for which it does not have jurisdiction under section 504, it will treat the complaint
as an ADA complaint under the procedures established in this subpart.

Section 35.171 also describes agency responsibilities for the processing of employment complaints. As
described in connection with {35.140, additional procedures regarding the coordination of employment
complaints will be established in a coordination regulation issued by DOJ and EEOC. Agencies with
jurisdiction under section 504 for complaints alleging employment discrimination also covered by title I
will follow the procedures established by the coordination regulation for those complaints. Complaints
covered by title I but not section 504 will be referred to the EEOC, and complaints covered by this part
but not title I will be processed under the procedures in this part.

## {35.172 Resolution of complaints.

Section 35.172 requires the designated agency to either resolve the complaint or issue to the complainant

and the public entity a Letter of Findings containing findings of fact and conclusions of law and a description of a remedy for each violation found.

The Act requires the Department of Justice to establish administrative procedures for resolution of complaints, but does not require complainants to exhaust these administrative remedies. The Committee Reports make clear that Congress intended to provide a private right of action with the full panoply of remedies for individual victims of discrimination. Because the Act does not require exhaustion of administrative remedies, the complainant may elect to proceed with a private suit at any time.

**{35.173 Voluntary compliance agreements.**

Section 35.173 requires the agency to attempt to resolve all complaints in which it finds noncompliance through voluntary compliance agreements enforceable by the Attorney General.

**{35.174 Referral.**

Section 35.174 provides for referral of the matter to the Department of Justice if the agency is unable to obtain voluntary compliance.

**{35.175 Attorney's fees.**

Section 35.175 states that courts are authorized to award attorneys fees, including litigation expenses and costs, as provided in section 505 of the Act. Litigation expenses include items such as expert witness fees, travel expenses, etc. The Judiciary Committee Report specifies that such items are included under the rubric of "attorneys fees" and not "costs" so that such expenses will be assessed against a plaintiff only under the standard set forth in *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412 (1978). (Judiciary report at 73.)

**{35.176 Alternative means of dispute resolution.**

Section 35.176 restates section 513 of the Act, which encourages use of alternative means of dispute resolution.

**{35.177 Effect of unavailability of technical assistance.**

Section 35.177 explains that, as provided in section 506(e) of the Act, a public entity is not excused from compliance with the requirements of this part because of any failure to receive technical assistance.

**{35.178 State immunity.**

Section 35.178 restates the provision of section 502 of the Act that a State is not immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court for violations of the Act, and that the same remedies are available for any such violations as are available in an action against an entity other than a State.

**Subpart G -- Designated Agencies**

**{35.190 Designated agencies.**

Subpart G designates the Federal agencies responsible for investigating complaints under this part. At

least 26 agencies currently administer programs of Federal financial assistance that are subject to the nondiscrimination requirements of section 504 as well as other civil rights statutes. A majority of these agencies administer modest programs of Federal financial assistance and/or devote minimal resources exclusively to "external" civil rights enforcement activities. Under Executive Order 12250, the Department of Justice has encouraged the use of delegation agreements under which certain civil rights compliance responsibilities for a class of recipients funded by more than one agency are delegated by an agency or agencies to a "lead" agency. For example, many agencies that fund institutions of higher education have signed agreements that designate the Department of Education as the "lead" agency for this class of recipients.

The use of delegation agreements reduces overlap and duplication of effort, and thereby strengthens overall civil rights enforcement. However, the use of these agreements to date generally has been limited to education and health care recipients. These classes of recipients are funded by numerous agencies and the logical connection to a lead agency is clear (e.g., the Department of Education for colleges and universities, and the Department of Health and Human Services for hospitals).

The ADA's expanded coverage of State and local government operations further complicates the process of establishing Federal agency jurisdiction for the purpose of investigating complaints of discrimination on the basis of disability. Because all operations of public entities now are covered irrespective of the presence or absence of Federal financial assistance, many additional State and local government functions and organizations now are subject to Federal jurisdiction. In some cases, there is no historical or single clear-cut subject matter relationship with a Federal agency as was the case in the education example described above. Further, the 33,000 governmental jurisdictions subject to the ADA differ greatly in their organization, making a detailed and workable division of Federal agency jurisdiction by individual State, county, or municipal entity unrealistic.

This regulation applies the delegation concept to the investigation of complaints of discrimination on the basis of disability by public entities under the ADA. It designates eight agencies, rather than all agencies currently administering programs of Federal financial assistance, as responsible for investigating complaints under this part. These "designated agencies" generally have the largest civil rights compliance staffs, the most experience in complaint investigations and disability issues, and broad yet clear subject area responsibilities. This division of responsibilities is made functionally rather than by public entity type or name designation. For example, all entities (regardless of their title) that exercise responsibilities, regulate, or administer services or programs relating to lands and natural resources fall within the jurisdiction of the Department of Interior.

Complaints under this part will be investigated by the designated agency most closely related to the functions exercised by the governmental component against which the complaint is lodged. For example, a complaint against a State medical board, where such a board is a recognizable entity, will be investigated by the Department of Health and Human Services (the designated agency for regulatory activities relating to the provision of health care), even if the board is part of a general umbrella department of planning and regulation (for which the Department of Justice is the designated agency). If two or more agencies have apparent responsibility over a complaint, section 35.190(c) provides that the Assistant Attorney General shall determine which one of the agencies shall be the designated agency for purposes of that complaint.

Thirteen commenters, including four proposed designated agencies, addressed the Department of Justice's identification in the proposed regulation of nine "designated agencies" to investigate complaints under this part. Most comments addressed the proposed specific delegations to the various individual agencies. The Department of Justice agrees with several commenters who pointed out that responsibility